(Slip Opinion) OCTOBER TERM, 2012 1

Syllabus

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## SALINAS *v.* TEXAS

CERTIORARI TO THE COURT OF CRIMINAL APPEALS OF TEXAS

No. 12–246.   Argued April 17, 2013—Decided June 17, 2013

Petitioner, without being placed in custody or receiving *Miranda* warnings, voluntarily answered some of a police officer's questions about a murder, but fell silent when asked whether ballistics testing would match his shotgun to shell casings found at the scene of the crime. At petitioner's murder trial in Texas state court, and over his objection, the prosecution used his failure to answer the question as evidence of guilt. He was convicted, and both the State Court of Appeals and Court of Criminal Appeals affirmed, rejecting his claim that the prosecution's use of his silence in its case in chief violated the Fifth Amendment.

*Held*: The judgment is affirmed.

369 S. W. 3d 176, affirmed.

JUSTICE ALITO, joined by THE CHIEF JUSTICE and JUSTICE KENNEDY, concluded that petitioner's Fifth Amendment claim fails because he did not expressly invoke the privilege in response to the officer's question. Pp. 3−12.

(a) To prevent the privilege against self-incrimination from shielding information not properly within its scope, a witness who "'desires the protection of the privilege . . . must claim it'" at the time he relies on it. *Minnesota* v. *Murphy*, 465 U. S. 420, 427. This Court has recognized two exceptions to that requirement. First, a criminal defendant need not take the stand and assert the privilege at his own trial. *Griffin* v. *California*, 380 U. S. 609, 613–615. Petitioner's silence falls outside this exception because he had no comparable unqualified right not to speak during his police interview. Second, a witness' failure to invoke the privilege against self-incrimination must be excused where governmental coercion makes his forfeiture of the privilege involuntary. See, *e.g.*, *Miranda* v. *Arizona*, 384 U. S. 436, 467−468, and n. 37. Petitioner cannot benefit from this principle

because it is undisputed that he agreed to accompany the officers to the station and was free to leave at any time. Pp. 3–6.

(b) Petitioner seeks a third exception to the express invocation requirement for cases where the witness chooses to stand mute rather than give an answer that officials suspect would be incriminating, but this Court's cases all but foreclose that argument. A defendant normally does not invoke the privilege by remaining silent. See *Roberts* v. *United States*, 445 U. S. 552, 560. And the express invocation requirement applies even when an official has reason to suspect that the answer to his question would incriminate the witness. See *Murphy*, *supra*, at 427–428. For the same reasons that neither a witness' silence nor official suspicion is sufficient by itself to relieve a witness of the obligation to expressly invoke the privilege, they do not do so together. The proposed exception also would be difficult to reconcile with *Berghuis* v. *Thompkins*, 560 U. S. 370, where this Court held in the closely related context of post-*Miranda* silence that a defendant failed to invoke his right to cut off police questioning when he remained silent for 2 hours and 45 minutes. *Id.,* at ___.

Petitioner claims that reliance on the Fifth Amendment privilege is the most likely explanation for silence in a case like his, but such silence is "insolubly ambiguous." See *Doyle* v. *Ohio*, 426 U. S. 610, 617. To be sure, petitioner might have declined to answer the officer's question in reliance on his constitutional privilege. But he also might have done so because he was trying to think of a good lie, because he was embarrassed, or because he was protecting someone else. Not every such possible explanation for silence is probative of guilt, but neither is every possible explanation protected by the Fifth Amendment. Petitioner also suggests that it would be unfair to require a suspect unschooled in the particulars of legal doctrine to do anything more than remain silent in order to invoke his "right to remain silent." But the Fifth Amendment guarantees that no one may be "compelled in any criminal case to be a witness against himself," not an unqualified "right to remain silent." In any event, it is settled that forfeiture of the privilege against self-incrimination need not be knowing. *Murphy*, 465 U. S., at 427–428. Pp. 6–10.

(c) Petitioner's argument that applying the express invocation requirement in this context will be unworkable is also unpersuasive. The Court has long required defendants to assert the privilege in order to subsequently benefit from it, and this rule has not proved difficult to apply in practice. Pp. 10–12.

JUSTICE THOMAS, joined by JUSTICE SCALIA, concluded that petitioner's claim would fail even if he invoked the privilege because the prosecutor's comments regarding his precustodial silence did not compel him to give self-incriminating testimony. *Griffin* v. *Califor-*

Syllabus

*nia*, 380 U. S. 609, in which this Court held that the Fifth Amendment prohibits a prosecutor or judge from commenting on a defendant's failure to testify, should not be extended to a defendant's silence during a precustodial interview because *Griffin* "lacks foundation in the Constitution's text, history, or logic." See *Mitchell* v. *United States*, 526 U. S. 314, 341 (THOMAS, J., dissenting). Pp. 1–2.

ALITO, J., announced the judgment of the Court and delivered an opinion, in which ROBERTS, C. J., and KENNEDY, J., joined. THOMAS, J., filed an opinion concurring in the judgment, in which SCALIA, J., joined. BREYER, J., filed a dissenting opinion, in which GINSBURG, SOTOMAYOR, and KAGAN, JJ., joined.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

No. 12–246

GENOVEVO SALINAS, PETITIONER *v.* TEXAS

ON WRIT OF CERTIORARI TO THE COURT OF CRIMINAL APPEALS OF TEXAS

[June 17, 2013]

JUSTICE ALITO announced the judgment of the Court and delivered an opinion in which THE CHIEF JUSTICE and JUSTICE KENNEDY join.

Without being placed in custody or receiving *Miranda* warnings, petitioner voluntarily answered the questions of a police officer who was investigating a murder. But petitioner balked when the officer asked whether a ballistics test would show that the shell casings found at the crime scene would match petitioner's shotgun. Petitioner was subsequently charged with murder, and at trial prosecutors argued that his reaction to the officer's question suggested that he was guilty. Petitioner claims that this argument violated the Fifth Amendment, which guarantees that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself."

Petitioner's Fifth Amendment claim fails because he did not expressly invoke the privilege against self-incrimination in response to the officer's question. It has long been settled that the privilege "generally is not self-executing" and that a witness who desires its protection "'must claim it.'" *Minnesota* v. *Murphy*, 465 U. S. 420, 425, 427 (1984) (quoting *United States* v. *Monia*, 317 U. S.

424, 427 (1943)). Although "no ritualistic formula is necessary in order to invoke the privilege," *Quinn* v. *United States*, 349 U. S. 155, 164 (1955), a witness does not do so by simply standing mute. Because petitioner was required to assert the privilege in order to benefit from it, the judgment of the Texas Court of Criminal Appeals rejecting petitioner's Fifth Amendment claim is affirmed.

I

On the morning of December 18, 1992, two brothers were shot and killed in their Houston home. There were no witnesses to the murders, but a neighbor who heard gunshots saw someone run out of the house and speed away in a dark-colored car. Police recovered six shotgun shell casings at the scene. The investigation led police to petitioner, who had been a guest at a party the victims hosted the night before they were killed. Police visited petitioner at his home, where they saw a dark blue car in the driveway. He agreed to hand over his shotgun for ballistics testing and to accompany police to the station for questioning.

Petitioner's interview with the police lasted approximately one hour. All agree that the interview was noncustodial, and the parties litigated this case on the assumption that he was not read *Miranda* warnings. See *Miranda* v. *Arizona*, 384 U. S. 436 (1966). For most of the interview, petitioner answered the officer's questions. But when asked whether his shotgun "would match the shells recovered at the scene of the murder," App. 17, petitioner declined to answer. Instead, petitioner "[l]ooked down at the floor, shuffled his feet, bit his bottom lip, cl[e]nched his hands in his lap, [and] began to tighten up." *Id.*, at 18. After a few moments of silence, the officer asked additional questions, which petitioner answered. *Ibid.*

Following the interview, police arrested petitioner on outstanding traffic warrants. Prosecutors soon concluded

that there was insufficient evidence to charge him with the murders, and he was released. A few days later, police obtained a statement from a man who said he had heard petitioner confess to the killings. On the strength of that additional evidence, prosecutors decided to charge petitioner, but by this time he had absconded. In 2007, police discovered petitioner living in the Houston area under an assumed name.

Petitioner did not testify at trial. Over his objection, prosecutors used his reaction to the officer's question during the 1993 interview as evidence of his guilt. The jury found petitioner guilty, and he received a 20-year sentence. On direct appeal to the Court of Appeals of Texas, petitioner argued that prosecutors' use of his silence as part of their case in chief violated the Fifth Amendment. The Court of Appeals rejected that argument, reasoning that petitioner's prearrest, pre-*Miranda* silence was not "compelled" within the meaning of the Fifth Amendment. 368 S. W. 3d 550, 557–559 (2011). The Texas Court of Criminal Appeals took up this case and affirmed on the same ground. 369 S. W. 3d 176 (2012).

We granted certiorari, 568 U. S. \_\_\_ (2013), to resolve a division of authority in the lower courts over whether the prosecution may use a defendant's assertion of the privilege against self-incrimination during a noncustodial police interview as part of its case in chief. Compare, *e.g., United States* v. *Rivera*, 944 F. 2d 1563, 1568 (CA11 1991), with *United States* v. *Moore*, 104 F. 3d 377, 386 (CADC 1997). But because petitioner did not invoke the privilege during his interview, we find it unnecessary to reach that question.

## II

### A

The privilege against self-incrimination "is an exception to the general principle that the Government has the right

to everyone's testimony." *Garner* v. *United States*, 424 U. S. 648, 658, n. 11 (1976). To prevent the privilege from shielding information not properly within its scope, we have long held that a witness who "'desires the protection of the privilege . . . must claim it'" at the time he relies on it. *Murphy*, 465 U. S., at 427 (quoting *Monia*, 317 U. S., at 427). See also *United States ex rel. Vajtauer* v. *Commissioner of Immigration*, 273 U. S. 103, 113 (1927).

That requirement ensures that the Government is put on notice when a witness intends to rely on the privilege so that it may either argue that the testimony sought could not be self-incriminating, see *Hoffman* v. *United States*, 341 U. S. 479, 486 (1951), or cure any potential self-incrimination through a grant of immunity, see *Kastigar* v. *United States*, 406 U. S. 441, 448 (1972). The express invocation requirement also gives courts tasked with evaluating a Fifth Amendment claim a contemporaneous record establishing the witness' reasons for refusing to answer. See *Roberts* v. *United States*, 445 U. S. 552, 560, n. 7 (1980) ("A witness may not employ the privilege to avoid giving testimony that he simply would prefer not to give"); *Hutcheson* v. *United States*, 369 U. S. 599, 610–611 (1962) (declining to treat invocation of due process as proper assertion of the privilege). In these ways, insisting that witnesses expressly invoke the privilege "assures that the Government obtains all the information to which it is entitled." *Garner*, *supra*, at 658, n. 11.

We have previously recognized two exceptions to the requirement that witnesses invoke the privilege, but neither applies here. First, we held in *Griffin* v. *California*, 380 U. S. 609, 613–615 (1965), that a criminal defendant need not take the stand and assert the privilege at his own trial. That exception reflects the fact that a criminal defendant has an "absolute right not to testify." *Turner* v. *United States*, 396 U. S. 398, 433 (1970) (Black, J., dissenting); see *United States* v. *Patane*, 542 U. S. 630,

637 (2004) (plurality opinion). Since a defendant's reasons for remaining silent at trial are irrelevant to his constitutional right to do so, requiring that he expressly invoke the privilege would serve no purpose; neither a showing that his testimony would not be self-incriminating nor a grant of immunity could force him to speak. Because petitioner had no comparable unqualified right during his interview with police, his silence falls outside the *Griffin* exception.

Second, we have held that a witness' failure to invoke the privilege must be excused where governmental coercion makes his forfeiture of the privilege involuntary. Thus, in *Miranda*, we said that a suspect who is subjected to the "inherently compelling pressures" of an unwarned custodial interrogation need not invoke the privilege. 384 U. S., at 467–468, and n. 37. Due to the uniquely coercive nature of custodial interrogation, a suspect in custody cannot be said to have voluntarily forgone the privilege "unless [he] fails to claim [it] after being suitably warned." *Murphy, supra*, at 429–430.

For similar reasons, we have held that threats to withdraw a governmental benefit such as public employment sometimes make exercise of the privilege so costly that it need not be affirmatively asserted. *Garrity* v. *New Jersey*, 385 U. S. 493, 497 (1967) (public employment). See also *Lefkowitz* v. *Cunningham*, 431 U. S. 801, 802–804 (1977) (public office); *Lefkowitz* v. *Turley*, 414 U. S. 70, 84–85 (1973) (public contracts). And where assertion of the privilege would itself tend to incriminate, we have allowed witnesses to exercise the privilege through silence. See, *e.g., Leary* v. *United States*, 395 U. S. 6, 28–29 (1969) (no requirement that taxpayer complete tax form where doing so would have revealed income from illegal activities); *Albertson* v. *Subversive Activities Control Bd.*, 382 U. S. 70, 77–79 (1965) (members of the Communist Party not required to complete registration form "where response to

any of the form's questions . . . might involve [them] in the admission of a crucial element of a crime"). The principle that unites all of those cases is that a witness need not expressly invoke the privilege where some form of official compulsion denies him "a 'free choice to admit, to deny, or to refuse to answer.'" *Garner*, 424 U. S*.,* at 656–657 (quoting *Lisenba* v. *California*, 314 U. S. 219, 241 (1941)).

Petitioner cannot benefit from that principle because it is undisputed that his interview with police was voluntary. As petitioner himself acknowledges, he agreed to accompany the officers to the station and "was free to leave at any time during the interview." Brief for Petitioner 2–3 (internal quotation marks omitted). That places petitioner's situation outside the scope of *Miranda* and other cases in which we have held that various forms of governmental coercion prevented defendants from voluntarily invoking the privilege. The dissent elides this point when it cites our precedents in this area for the proposition that "[c]ircumstances, rather than explicit invocation, trigger the protection of the Fifth Amendment." *Post,* at 7–8 (opinion of BREYER, J.). The critical question is whether, under the "circumstances" of this case, petitioner was deprived of the ability to voluntarily invoke the Fifth Amendment. He was not. We have before us no allegation that petitioner's failure to assert the privilege was involuntary, and it would have been a simple matter for him to say that he was not answering the officer's question on Fifth Amendment grounds. Because he failed to do so, the prosecution's use of his noncustodial silence did not violate the Fifth Amendment.

## B

Petitioner urges us to adopt a third exception to the invocation requirement for cases in which a witness stands mute and thereby declines to give an answer that officials suspect would be incriminating. Our cases all but

foreclose such an exception, which would needlessly bur-
den the Government's interests in obtaining testimony
and prosecuting criminal activity. We therefore decline
petitioner's invitation to craft a new exception to the
"general rule" that a witness must assert the privilege to
subsequently benefit from it. *Murphy*, 465 U. S., at 429.

Our cases establish that a defendant normally does not
invoke the privilege by remaining silent. In *Roberts* v.
*United States*, 445 U. S. 552, for example, we rejected the
Fifth Amendment claim of a defendant who remained
silent throughout a police investigation and received a
harsher sentence for his failure to cooperate. In so ruling,
we explained that "if [the defendant] believed that his
failure to cooperate was privileged, he should have said so
at a time when the sentencing court could have deter-
mined whether his claim was legitimate." *Id.,* at 560. See
also *United States* v. *Sullivan*, 274 U. S. 259, 263–264
(1927); *Vajtauer*, 273 U. S., at 113.[1] A witness does not
expressly invoke the privilege by standing mute.

We have also repeatedly held that the express invoca-
tion requirement applies even when an official has reason
to suspect that the answer to his question would incrim-
inate the witness. Thus, in *Murphy* we held that the
defendant's self-incriminating answers to his probation of-
ficer were properly admitted at trial because he failed to
invoke the privilege. 465 U. S., at 427–428. In reaching
that conclusion, we rejected the notion "that a witness

--------

[1] The dissent argues that in these cases "neither the nature of the
questions nor the circumstances of the refusal to answer them provided
any basis to infer a tie between the silence and the Fifth Amendment."
*Post,* at 5–6 (opinion of BREYER, J.). But none of our precedents sug-
gests that governmental officials are obliged to guess at the meaning of
a witness' unexplained silence when implicit reliance on the Fifth
Amendment seems probable. *Roberts* does not say as much, despite its
holding that the defendant in that case was required to explain the
Fifth Amendment basis for his failure to cooperate with an investiga-
tion that led to his prosecution. 445 U. S., at 559.

must 'put the Government on notice by formally availing himself of the privilege' only when he alone 'is reasonably aware of the incriminating tendency of the questions.'" *Id.,* at 428 (quoting *Roberts, supra,* at 562, n.* (Brennan, J., concurring)). See also *United States* v. *Kordel,* 397 U. S. 1, 7 (1970).[2]

Petitioner does not dispute the vitality of either of those lines of precedent but instead argues that we should adopt an exception for cases at their intersection. Thus, petitioner would have us hold that although neither a witness' silence nor official suspicions are enough to excuse the express invocation requirement, the invocation requirement does not apply where a witness is silent in the face of official suspicions. For the same reasons that neither of those factors is sufficient by itself to relieve a witness of the obligation to expressly invoke the privilege, we conclude that they do not do so together. A contrary result would do little to protect those genuinely relying on the Fifth Amendment privilege while placing a needless new burden on society's interest in the admission of evidence that is probative of a criminal defendant's guilt.

Petitioner's proposed exception would also be very difficult to reconcile with *Berghuis* v. *Thompkins,* 560 U. S. 370 (2010). There, we held in the closely related context of post-*Miranda* silence that a defendant failed to invoke the

_____

[2] Our cases do not support the distinction the dissent draws between silence and the failure to invoke the privilege before making incriminating statements. See *post,* at 7 (BREYER, J., dissenting). For example, *Murphy,* a case in which the witness made incriminating statements after failing to invoke the privilege, repeatedly relied on *Roberts* and *Vajtauer*—two cases in which witnesses remained silent and did not make incriminating statements. 465 U. S., at 427, 429, 455–456, n. 20. Similarly, *Kordel* cited *Vajtauer,* among other cases, for the proposition that the defendant's "failure at any time to assert the constitutional privilege leaves him in no position to complain now that he was compelled to give testimony against himself." 397 U. S., at 10, and n. 18.

privilege when he refused to respond to police questioning for 2 hours and 45 minutes. 560 U. S., at \_\_\_ (slip op., at 3, 8–10). If the extended custodial silence in that case did not invoke the privilege, then surely the momentary silence in this case did not do so either.

Petitioner and the dissent attempt to distinguish *Berghuis* by observing that it did not concern the admissibility of the defendant's silence but instead involved the admissibility of his subsequent statements. *Post,* at 8–9 (opinion of BREYER, J.). But regardless of whether prosecutors seek to use silence or a confession that follows, the logic of *Berghuis* applies with equal force: A suspect who stands mute has not done enough to put police on notice that he is relying on his Fifth Amendment privilege.[3]

In support of their proposed exception to the invocation requirement, petitioner and the dissent argue that reliance on the Fifth Amendment privilege is the most likely explanation for silence in a case such as this one. Reply Brief 17; see *post,* at 9–10 (BREYER, J., dissenting). But whatever the most probable explanation, such silence is "insolubly ambiguous." See *Doyle*, v. *Ohio,* 426 U. S. 610, 617 (1976). To be sure, someone might decline to answer a police officer's question in reliance on his constitutional privilege. But he also might do so because he is trying to think of a good lie, because he is embarrassed, or because he is protecting someone else. Not every such possible explanation for silence is probative of guilt, but neither is every possible explanation protected by the Fifth Amendment. Petitioner alone knew why he did not answer the officer's question, and it was therefore his "burden . . . to

---

[3] Petitioner is correct that *due process* prohibits prosecutors from pointing to the fact that a defendant was silent after he heard *Miranda* warnings, *Doyle* v. *Ohio*, 426 U. S. 610, 617–618 (1976), but that rule does not apply where a suspect has not received the warnings' implicit promise that any silence will not be used against him, *Jenkins* v. *Anderson*, 447 U. S. 231, 240 (1980).

make a timely assertion of the privilege." *Garner*, 424 U. S., at 655.

At oral argument, counsel for petitioner suggested that it would be unfair to require a suspect unschooled in the particulars of legal doctrine to do anything more than remain silent in order to invoke his "right to remain silent." Tr. of Oral Arg. 26–27; see *post,* at 10 (BREYER, J., dissenting); *Michigan* v. *Tucker*, 417 U. S. 433, 439 (1974) (observing that "virtually every schoolboy is familiar with the concept, if not the language" of the Fifth Amendment). But popular misconceptions notwithstanding, the Fifth Amendment guarantees that no one may be "compelled in any criminal case to be a witness against himself"; it does not establish an unqualified "right to remain silent." A witness' constitutional right to refuse to answer questions depends on his reasons for doing so, and courts need to know those reasons to evaluate the merits of a Fifth Amendment claim. See *Hoffman*, 341 U. S., at 486–487.[4]

In any event, it is settled that forfeiture of the privilege against self-incrimination need not be knowing. *Murphy*, 465 U. S., at 427–428; *Garner*, *supra*, at 654, n. 9. Statements against interest are regularly admitted into evidence at criminal trials, see Fed. Rule of Evid. 804(b)(3), and there is no good reason to approach a defendant's silence any differently.

## C

Finally, we are not persuaded by petitioner's arguments

---

[4] The dissent suggests that officials in this case had no "special need to know whether the defendant sought to rely on the protections of the Fifth Amendment." *Post,* at 4 (opinion of BREYER, J.). But we have never said that the government must demonstrate such a need on a case-by-case basis for the invocation requirement to apply. Any such rule would require judicial hypothesizing about the probable strategic choices of prosecutors, who often use immunity to compel testimony from witnesses who invoke the Fifth Amendment.

that applying the usual express invocation requirement where a witness is silent during a noncustodial police interview will prove unworkable in practice. Petitioner and the dissent suggest that our approach will "unleash complicated and persistent litigation" over what a suspect must say to invoke the privilege, Reply Brief 18; see *post,* at 11–12 (opinion of BREYER, J.), but our cases have long required that a witness assert the privilege to subsequently benefit from it. That rule has not proved difficult to apply. Nor did the potential for close cases dissuade us from adopting similar invocation requirements for suspects who wish to assert their rights and cut off police questioning during custodial interviews. *Berghuis*, 560 U. S*.,* at \_\_\_ (slip op., at 8–10) (requiring suspect to unambiguously assert privilege against self-incrimination to cut off custodial questioning); *Davis* v. *United States*, 512 U. S. 452, 459 (1994) (same standard for assertions of the right to counsel).

Notably, petitioner's approach would produce its own line-drawing problems, as this case vividly illustrates. When the interviewing officer asked petitioner if his shotgun would match the shell casings found at the crime scene, petitioner did not merely remain silent; he made movements that suggested surprise and anxiety. At precisely what point such reactions transform "silence" into expressive conduct would be a difficult and recurring question that our decision allows us to avoid.

We also reject petitioner's argument that an express invocation requirement will encourage police officers to "'unfairly "tric[k]"'" suspects into cooperating. Reply Brief 21 (quoting *South Dakota* v. *Neville*, 459 U. S. 553, 566 (1983)). Petitioner worries that officers could unduly pressure suspects into talking by telling them that their silence could be used in a future prosecution. But as petitioner himself concedes, police officers "have done nothing wrong" when they "accurately stat[e] the law."

Brief for Petitioner 32. We found no constitutional infirmity in government officials telling the defendant in *Murphy* that he was required to speak truthfully to his parole officer, 465 U. S., at 436–438, and we see no greater danger in the interview tactics petitioner identifies. So long as police do not deprive a witness of the ability to voluntarily invoke the privilege, there is no Fifth Amendment violation.

\* \* \*

Before petitioner could rely on the privilege against self-incrimination, he was required to invoke it. Because he failed to do so, the judgment of the Texas Court of Criminal Appeals is affirmed.

*It is so ordered.*

# SUPREME COURT OF THE UNITED STATES

No. 12–246

GENOVEVO SALINAS, PETITIONER *v.* TEXAS

ON WRIT OF CERTIORARI TO THE COURT OF CRIMINAL
APPEALS OF TEXAS

[June 17, 2013]

JUSTICE THOMAS, with whom JUSTICE SCALIA joins, concurring in the judgment.

We granted certiorari to decide whether the Fifth Amendment privilege against compulsory self-incrimination prohibits a prosecutor from using a defendant's pre-custodial silence as evidence of his guilt. The plurality avoids reaching that question and instead concludes that Salinas' Fifth Amendment claim fails because he did not expressly invoke the privilege. *Ante,* at 3. I think there is a simpler way to resolve this case. In my view, Salinas' claim would fail even if he had invoked the privilege because the prosecutor's comments regarding his precustodial silence did not compel him to give self-incriminating testimony.

In *Griffin* v. *California,* 380 U. S. 609 (1965), this Court held that the Fifth Amendment prohibits a prosecutor or judge from commenting on a defendant's failure to testify. *Id.,* at 614. The Court reasoned that such comments, and any adverse inferences drawn from them, are a "penalty" imposed on the defendant's exercise of his Fifth Amendment privilege. *Ibid.* Salinas argues that we should extend *Griffin*'s no-adverse-inference rule to a defendant's silence during a precustodial interview. I have previously explained that the Court's decision in *Griffin* "lacks foundation in the Constitution's text, history, or logic" and should not be extended. See *Mitchell* v. *United States*, 526

U. S. 314, 341 (1999) (dissenting opinion). I adhere to that view today.

*Griffin* is impossible to square with the text of the Fifth Amendment, which provides that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." A defendant is not "compelled . . . to be a witness against himself" simply because a jury has been told that it may draw an adverse inference from his silence. See *Mitchell, supra,* at 331 (SCALIA, J., dissenting) ("[T]he threat of an adverse inference does not 'compel' anyone to testify. . . . Indeed, I imagine that in most instances, a guilty defendant would choose to remain silent *despite* the adverse inference, on the theory that it would do him less damage than his cross-examined testimony"); *Carter* v. *Kentucky*, 450 U. S. 288, 306 (1981) (Powell, J., concurring) ("[N]othing in the [Self-Incrimination] Clause requires that jurors not draw logical inferences when a defendant chooses not to explain incriminating circumstances").

Nor does the history of the Fifth Amendment support *Griffin*. At the time of the founding, English and American courts strongly encouraged defendants to give un-sworn statements and drew adverse inferences when they failed to do so. See *Mitchell*, *supra,* at 332 (SCALIA, J., dissenting); Alschuler, A Peculiar Privilege in Historical Perspective, in The Privilege Against Self-Incrimination 204 (R. Hemholz et al. eds. 1997). Given *Griffin*'s indefensible foundation, I would not extend it to a defendant's silence during a precustodial interview. I agree with the plurality that Salinas' Fifth Amendment claim fails and, therefore, concur in the judgment.

# SUPREME COURT OF THE UNITED STATES

———————

No. 12–246

———————

## GENOVEVO SALINAS, PETITIONER *v.* TEXAS

ON WRIT OF CERTIORARI TO THE COURT OF CRIMINAL
APPEALS OF TEXAS

[June 17, 2013]

JUSTICE BREYER, with whom JUSTICE GINSBURG, JUSTICE SOTOMAYOR, and JUSTICE KAGAN join, dissenting.

In my view the Fifth Amendment here prohibits the prosecution from commenting on the petitioner's silence in response to police questioning. And I dissent from the Court's contrary conclusion.

I

In January 1993, Houston police began to suspect petitioner Genovevo Salinas of having committed two murders the previous month. They asked Salinas to come to the police station "to take photographs and to clear him as [a] suspect." App. 3. At the station, police took Salinas into what he describes as "an interview room." Brief for Petitioner 3. Because he was "free to leave at that time," App. 14, they did not give him *Miranda* warnings. The police then asked Salinas questions. And Salinas answered until the police asked him whether the shotgun from his home "would match the shells recovered at the scene of the murder." *Id.,* at 17. At that point Salinas fell silent. *Ibid.*

Salinas was later tried for, and convicted of, murder. At closing argument, drawing on testimony he had elicited earlier, the prosecutor pointed out to the jury that Salinas, during his earlier questioning at the police station, had remained silent when asked about the shotgun. The prosecutor told the jury, among other things, that "'[a]n

innocent person'" would have said, "'What are you talking about? I didn't do that. I wasn't there.'" 368 S. W. 3d 550, 556 (Tex. Ct. App. 2011). But Salinas, the prosecutor said, "'didn't respond that way.'" *Ibid.* Rather, "'[h]e wouldn't answer that question.'" *Ibid.*

## II

The question before us is whether the Fifth Amendment prohibits the prosecutor from eliciting and commenting upon the evidence about Salinas' silence. The plurality believes that the Amendment does not bar the evidence and comments because Salinas "did not expressly invoke the privilege against self-incrimination" when he fell silent during the questioning at the police station. *Ante,* at 1. But, in my view, that conclusion is inconsistent with this Court's case law and its underlying practical rationale.

## A

The Fifth Amendment prohibits prosecutors from commenting on an individual's silence where that silence amounts to an effort to avoid becoming "a witness against himself." This Court has specified that "a rule of evidence" permitting "commen[t] . . . by counsel" in a criminal case upon a defendant's failure to testify "violates the Fifth Amendment." *Griffin* v. *California*, 380 U. S. 609, 610, n. 2, 613 (1965) (internal quotation marks omitted). See also *United States* v. *Patane*, 542 U. S. 630, 637 (2004) (plurality opinion); *Turner* v. *United States*, 396 U. S. 398, 433 (1970) (Black, J., dissenting). And, since "it is impermissible to penalize an individual for exercising his Fifth Amendment privilege when he is under police custodial interrogation," the "prosecution may not . . . use at trial *the fact that he stood mute* or claimed his privilege in the face of accusation." *Miranda* v. *Arizona*, 384 U. S. 436, 468, n. 37 (1966) (emphasis added).

Particularly in the context of police interrogation, a

contrary rule would undermine the basic protection that the Fifth Amendment provides. Cf. *Kastigar* v. *United States*, 406 U. S. 441, 461 (1972) ("The privilege . . . usually operates to allow a citizen to remain silent when asked a question requiring an incriminatory answer"). To permit a prosecutor to comment on a defendant's constitutionally protected silence would put that defendant in an impossible predicament. He must either answer the question or remain silent. If he answers the question, he may well reveal, for example, prejudicial facts, disreputable associates, or suspicious circumstances—even if he is innocent. See, *e.g., Griffin*, *supra*, at 613; Kassin, Inside Interrogation: Why Innocent People Confess, 32 Am. J. Trial Advoc. 525, 537 (2009). If he remains silent, the prosecutor may well use that silence to suggest a consciousness of guilt. And if the defendant then takes the witness stand in order to explain either his speech or his silence, the prosecution may introduce, say for impeachment purposes, a prior conviction that the law would otherwise make inadmissible. Thus, where the Fifth Amendment is at issue, to allow comment on silence directly or indirectly can compel an individual to act as "a witness against himself"—very much what the Fifth Amendment forbids. Cf. *Pennsylvania* v. *Muniz*, 496 U. S. 582, 596–597 (1990) (definition of "testimonial" includes responses to questions that require a suspect to communicate an express or implied assertion of fact or belief). And that is similarly so whether the questioned individual, as part of his decision to remain silent, invokes the Fifth Amendment explicitly or implicitly, through words, through deeds, or through reference to surrounding circumstances.

### B

It is consequently not surprising that this Court, more than half a century ago, explained that "no ritualistic formula is necessary in order to invoke the privilege."

*Quinn* v. *United States*, 349 U. S. 155, 164 (1955).    Thus, a prosecutor may not comment on a defendant's failure to testify at trial—even if neither the defendant nor anyone else ever mentions a Fifth Amendment right not to do so. Circumstances, not a defendant's statement, tie the defendant's silence to the right.  Similarly, a prosecutor may not comment on the fact that a defendant in custody, *after* receiving *Miranda* warnings, "stood mute"—regardless of whether he "claimed his privilege" in so many words. *Miranda*, *supra*, at 468, n. 37.  Again, it is not any explicit statement but, instead, the defendant's deeds (silence) and circumstances (receipt of the warnings) that tie together silence and constitutional right.  Most lower courts have so construed the law, even where the defendant, having received *Miranda* warnings, answers some questions while remaining silent as to others.  See, *e.g., Hurd* v. *Terhune*, 619 F. 3d 1080, 1087 (CA9 2010); *United States* v. *May*, 52 F. 3d 885, 890 (CA10 1995); *United States* v. *Scott*, 47 F. 3d 904, 907 (CA7 1995); *United States* v. *Canterbury*, 985 F. 2d 483, 486 (CA10 1993); *Grieco* v. *Hall*, 641 F. 2d 1029, 1034 (CA1 1981); *United States* v. *Ghiz*, 491 F. 2d 599, 600 (CA4 1974).  But see, *e.g., United States* v. *Harris*, 956 F. 2d 177, 181 (CA8 1992).

The cases in which this Court has insisted that a defendant expressly mention the Fifth Amendment by name in order to rely on its privilege to protect silence are cases where (1) the circumstances surrounding the silence (unlike the present case) did not give rise to an inference that the defendant intended, by his silence, to exercise his Fifth Amendment rights; *and* (2) the questioner greeted by the silence (again unlike the present case) had a special need to know whether the defendant sought to rely on the protections of the Fifth Amendment.  See *ante,* at 4 (explaining that, in such cases, the government needs to know the basis for refusing to answer "so that it may either argue that the testimony sought could not be self-

incriminating or cure any potential self-incrimination through a grant of immunity" (citation omitted)). These cases include *Roberts*, *Rogers*, *Sullivan*, *Vajtauer*, and *Jenkins*—all of which at least do involve the protection of *silence*—and also include cases emphasized by the plurality that are not even about silence—namely, *Murphy* and *Garner*.

In *Roberts* and *Rogers*, the individual refused to answer questions that government investigators (in *Roberts*) and a grand jury (in *Rogers*) asked, principally because the individual wanted to avoid incriminating *other persons*. *Roberts* v. *United States*, 445 U. S. 552, 553–556 (1980); *Rogers* v. *United States*, 340 U. S. 367, 368–370, and n. 4 (1951). But the Fifth Amendment does not protect someone from incriminating others; it protects against *self-*incrimination. In turn, neither the nature of the questions nor the circumstances of the refusal to answer them provided any basis to infer a tie between the silence and the Fifth Amendment, while knowledge of any such tie would have proved critical to the questioner's determination as to *whether* the defendant had any proper legal basis for claiming Fifth Amendment protection.

In *Sullivan*, the defendant's silence consisted of his failure to file a tax return—a return, he later claimed, that would have revealed his illegal activity as a bootlegger. *United States* v. *Sullivan*, 274 U. S. 259, 262–264 (1927). The circumstances did not give rise to an inference of a tie between his silence (in the form of failing to file a tax return) and the Fifth Amendment; and, if he really did want to rely on the Fifth Amendment, then the government would have had special need to know of any such tie in order to determine whether, for example, the assertion of privilege was valid and, perhaps, an offer of immunity was appropriate.

In *Vajtauer*, an alien refused to answer questions asked by an immigration official at a deportation proceeding.

*United States ex rel. Vajtauer* v. *Commissioner of Immigration*, 273 U. S. 103, 113 (1927). Here, the circumstances gave rise to a distinct inference that the alien was *not* invoking any Fifth Amendment privilege: The alien's lawyer had stated quite publicly at the hearing that he advised his client to remain silent *not* on Fifth Amendment grounds; rather, the lawyer "'advise[d] the alien not to answer any further questions until the evidence upon which the warrant is based will be presented here.'" *Id.,* at 106–107 (quoting the lawyer). This statement weakened or destroyed the possibility of a silence-Fifth Amendment linkage; the Government could not challenge his right to invoke the Fifth Amendment; and this Court described its later invocation as "evidently an afterthought." *Id.,* at 113.

Perhaps most illustrative is *Jenkins*, a case upon which the plurality relies, *ante,* at 9, n. 3, and upon which the Texas Court of Criminal Appeals relied almost exclusively, 369 S. W. 3d 176, 178–179 (2012). Jenkins killed someone, and was not arrested until he turned himself in two weeks later. *Jenkins* v. *Anderson*, 447 U. S. 231, 232 (1980). On cross-examination at his trial, Jenkins claimed that his killing was in self-defense after being attacked. *Id.,* at 232–233. The prosecutor then asked why he did not report the alleged attack, and in closing argument suggested that Jenkins' failure to do so cast doubt on his claim to have acted in self-defense. *Id.,* at 233–234. We explained that this unusual form of "prearrest silence" was not constitutionally protected from use at trial. *Id.,* at 240. Perhaps even more aptly, Justice Stevens' concurrence noted that "the privilege against compulsory self-incrimination is simply irrelevant" in such circumstances. *Id.,* at 241 (footnote omitted). How would anyone have known that Jenkins, while failing to report an attack, was relying on the Fifth Amendment? And how would the government have had any way of determining whether his

claim was valid? In *Jenkins*, as in *Roberts*, *Rogers*, *Sullivan*, and *Vajtauer*, no one had any reason to connect silence to the Fifth Amendment; and the government had no opportunity to contest any alleged connection.

Still further afield from today's case are *Murphy* and *Garner*, neither of which involved silence at all. Rather, in both cases, a defendant had earlier *answered* questions posed by the government—in *Murphy*, by speaking with a probation officer, and in *Garner*, by completing a tax return. *Minnesota* v. *Murphy*, 465 U. S. 420, 422–425 (1984); *Garner* v. *United States*, 424 U. S. 648, 649–650 (1976). At the time of providing answers, neither circumstances nor deeds nor words suggested reliance on the Fifth Amendment: Murphy simply answered questions posed by his probation officer; Garner simply filled out a tax return. They did not argue that their self-incriminating statements had been "compelled" in violation of the Fifth Amendment until later, at trial. *Murphy, supra*, at 425, 431; *Garner, supra*, at 649, 665. The Court held that those statements were *not* compelled. *Murphy, supra*, at 440; *Garner, supra*, at 665. The circumstances indicated that the defendants had affirmatively chosen to speak and to write.

Thus, we have two sets of cases: One where express invocation of the Fifth Amendment was not required to tie one's silence to its protections, and another where something like express invocation was required, because circumstances demanded some explanation for the silence (or the statements) in order to indicate that the Fifth Amendment was at issue.

There is also a third set of cases, cases that may well fit into the second category but where the Court has held that the Fifth Amendment both applies and does not require express invocation *despite* ambiguous circumstances. The Court in those cases has made clear that an individual, when silent, need not expressly invoke the Fifth Amend-

ment if there are "inherently compelling pressures" not to do so. *Miranda*, 384 U. S., at 467. Thus, in *Garrity* v. *New Jersey,* 385 U. S. 493, 497 (1967), the Court held that no explicit assertion of the Fifth Amendment was required where, in the course of an investigation, such assertion would, by law, have cost police officers their jobs. Similarly, this Court did not require explicit assertion in response to a grand jury subpoena where that assertion would have cost two architects their public contracts or a political official his job. *Lefkowitz* v. *Turley*, 414 U. S. 70, 75–76 (1973); *Lefkowitz* v. *Cunningham*, 431 U. S. 801, 802–804 (1977). In *Leary* v. *United States*, 395 U. S. 6, 28–29 (1969), the Court held that the Fifth Amendment did not require explicit assertion of the privilege against self-incrimination because, in the context of the Marihuana Tax Act, such assertion would have been inherently incriminating. In *Albertson* v. *Subversive Activities Control Bd.*, 382 U. S. 70, 77–79 (1965), we held the same where explicit assertion of the Fifth Amendment would have required, as a first step, the potentially incriminating admission of membership in the Communist Party. The Court has also held that gamblers, without explicitly invoking the Fifth Amendment, need not comply with tax requirements that would, inherently and directly, lead to self-incrimination. *Marchetti* v. *United States*, 390 U. S. 39, 60–61 (1968); *Grosso* v. *United States*, 390 U. S. 62, 67–68 (1968). All told, this third category of cases receives the same treatment as the first: Circumstances, rather than explicit invocation, trigger the protection of the Fifth Amendment. So, too, in today's case.

The plurality refers to one additional case, namely *Berghuis* v. *Thompkins*, 560 U. S. 370 (2010). See *ante,* at 8. But that case is here beside the point. In *Berghuis*, the defendant was in custody, he had been informed of his *Miranda* rights, and he was subsequently silent in the face of 2 hours and 45 minutes of questioning before he

offered any substantive answers. *Id.,* at \_\_\_–\_\_\_ (slip op., at 2–4). The Court held that he had waived his Fifth Amendment rights in respect to his *later speech.* The Court said nothing at all about a prosecutor's right to comment on his preceding silence and no prosecutor sought to do so. Indeed, how could a prosecutor lawfully have tried to do so, given this Court's statement in *Miranda* itself that a prosecutor cannot comment on the fact that, after receiving *Miranda* warnings, the suspect "stood mute"? 384 U. S., at 468, n. 37.

We end where we began. "[N]o ritualistic formula is necessary in order to invoke the privilege." *Quinn,* 349 U. S., at 164. Much depends on the circumstances of the particular case, the most important circumstances being: (1) whether one can fairly infer that the individual being questioned is invoking the Amendment's protection; (2) if that is unclear, whether it is particularly important for the questioner to know whether the individual is doing so; and (3) even if it is, whether, in any event, there is a good reason for excusing the individual from referring to the Fifth Amendment, such as inherent penalization simply by answering.

C

Applying these principles to the present case, I would hold that Salinas need not have expressly invoked the Fifth Amendment. The context was that of a criminal investigation. Police told Salinas that and made clear that he was a suspect. His interrogation took place at the police station. Salinas was not represented by counsel. The relevant question—about whether the shotgun from Salinas' home would incriminate him—amounted to a switch in subject matter. And it was obvious that the new question sought to ferret out whether Salinas was guilty of murder. See 368 S. W. 3d, at 552–553.

These circumstances give rise to a reasonable inference

that Salinas' silence derived from an exercise of his Fifth
Amendment rights. This Court has recognized repeatedly
that many, indeed most, Americans are aware that they
have a constitutional right not to incriminate themselves
by answering questions posed by the police during an
interrogation conducted in order to figure out the perpe-
trator of a crime. See *Dickerson* v. *United States*, 530
U. S. 428, 443 (2000); *Brogan* v. *United States*, 522 U. S.
398, 405 (1998); *Michigan* v. *Tucker*, 417 U. S. 433, 439
(1974). The nature of the surroundings, the switch of
topic, the particular question—all suggested that the right
we have and generally *know* we have was at issue at the
critical moment here. Salinas, not being represented by
counsel, would not likely have used the precise words
"Fifth Amendment" to invoke his rights because he would
not likely have been aware of technical legal require-
ments, such as a need to identify the Fifth Amendment by
name.

At the same time, the need to categorize Salinas' silence
as based on the Fifth Amendment is supported here by the
presence, in full force, of the predicament I discussed
earlier, namely that of not forcing Salinas to choose be-
tween incrimination through speech and incrimination
through silence. That need is also supported by the ab-
sence of any special reason that the police had to know,
with certainty, whether Salinas was, in fact, relying on the
Fifth Amendment—such as whether to doubt that there
really was a risk of self-incrimination, see *Hoffman* v.
*United States*, 341 U. S. 479, 486 (1951), or whether to
grant immunity, see *Kastigar*, 406 U. S., at 448. Given
these circumstances, Salinas' silence was "sufficient to put
the [government] on notice of an apparent claim of the
privilege." *Quinn*, *supra*, at 164. That being so, for rea-
sons similar to those given in *Griffin*, the Fifth Amend-
ment bars the evidence of silence admitted against Salinas
and mentioned by the prosecutor. See 380 U. S., at 614–615.

D

I recognize that other cases may arise where facts and circumstances surrounding an individual's silence present a closer question. The critical question—whether those circumstances give rise to a fair inference that the silence rests on the Fifth Amendment—will not always prove easy to administer. But that consideration does not support the plurality's rule-based approach here, for the administrative problems accompanying the plurality's approach are even worse.

The plurality says that a suspect must "expressly invoke the privilege against self-incrimination." *Ante,* at 1. But does it really mean that the suspect must use the exact words "Fifth Amendment"? How can an individual who is not a lawyer know that these particular words are legally magic? Nor does the Solicitor General help when he adds that the suspect may "mak[e] the claim 'in any language that [the questioner] may reasonably be expected to understand as an attempt to invoke the privilege.'" Brief for United States as *Amicus Curiae* 22 (quoting *Quinn, supra,* at 162–163; alteration in original). What counts as "making the claim"? Suppose the individual says, "Let's discuss something else," or "I'm not sure I want to answer that"; or suppose he just gets up and leaves the room. Cf. *Davis* v. *Mississippi,* 394 U. S. 721, 727, n. 6 (1969) (affirming "the settled principle that while the police have the right to request citizens to answer voluntarily questions concerning unsolved crimes[,] they have no right to compel them to answer"); *Berkemer* v. *McCarty,* 468 U. S. 420, 439 (1984) (noting that even someone detained in a *Terry* stop "is not obliged to respond" to police questions); *Florida* v. *Royer,* 460 U. S. 491, 497–498 (1983) (plurality opinion). How is simple silence in the present context any different?

The basic problem for the plurality is that an effort to have a simple, clear "explicit statement" rule poses a serious obstacle to those who, like Salinas, seek to assert

their basic Fifth Amendment right to remain silent, for they are likely unaware of any such linguistic detail. At the same time, acknowledging that our case law does not require use of specific words, see *ante,* at 2, leaves the plurality without the administrative benefits it might hope to find in requiring that detail.

Far better, in my view, to pose the relevant question directly: Can one fairly infer from an individual's silence and surrounding circumstances an exercise of the Fifth Amendment's privilege? The need for simplicity, the constitutional importance of applying the Fifth Amendment to those who seek its protection, and this Court's case law all suggest that this is the right question to ask here. And the answer to that question in the circumstances of today's case is clearly: yes.

For these reasons, I believe that the Fifth Amendment prohibits a prosecutor from commenting on Salinas's silence. I respectfully dissent from the Court's contrary conclusion.