[Cite as *State v. Speis*, 2023-Ohio-1422.]

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

CLERMONT COUNTY

| | | |
|---|---|---|
| STATE OF OHIO, | : | |
| Appellee, | : | CASE NO. CA2022-07-032 |
| | : | O P I N I O N |
| - vs - | | 5/1/2023 |
| | : | |
| ERIC J. SPEIS, | : | |
| Appellant. | : | |

CRIMINAL APPEAL FROM CLERMONT COUNTY COURT OF COMMON PLEAS
Case No. 2020 CR 01043

Mark J. Tekulve, Clermont County Prosecuting Attorney, and Nicholas Horton, Assistant Prosecuting Attorney, for appellee.

Samuel H. Shamansky Co., L.P.A., and Samuel H. Shamansky and David J. Betras, for appellant.

**HENDRICKSON, J.**

{¶1} Appellant, Eric Speis, appeals from his conviction in the Clermont County Court of Common Pleas after a jury found him guilty of seven counts of gross sexual imposition. For the reasons outlined below, we affirm his convictions.

**I. Facts and Procedural History**

{¶2} In December 2020, Speis was indicted on seven counts of gross sexual

imposition under R.C. 2907.05(A)(4), all third-degree felonies. The charges stemmed from allegations that Speis had sexually abused M.R., the eight-year-old daughter of his girlfriend, over an eight-month period. At the time, Speis was living with his girlfriend, M.R. and M.R.'s maternal grandmother in the girlfriend's home. In May of 2020, the girlfriend observed Speis sitting in a recliner with M.R. on his lap. When M.R. saw her mother, she jumped off Speis's lap and ran to the couch. Later, M.R. revealed that she and Speis had been kissing when her mother saw them. The girlfriend had Speis run an errand with her so she could confront him about the incident. When she did, Speis remained silent and did not respond.

{¶3} When they returned to the home, the girlfriend and grandmother gathered Speis and M.R. into the living room so that they could address Speis about the allegations M.R. had made. Initially, Speis acted like he didn't know what they were talking about but later admitted to "innocuous touching" and claimed he was trying to teach M.R. so that boys would not take advantage of her.

{¶4} At this point, the girlfriend became irate and started yelling at Speis and told him to leave. She then went outside and started throwing around patio furniture that was on the back deck. This caused the neighbors to call the police. When the girlfriend went back inside the home, she found Speis with a gun to his head threatening to kill himself. Fortunately, the girlfriend and grandmother were successful in persuading him not to go through with it.

{¶5} Sometime later, two police officers arrived at the scene. M.R. told them that Speis had made her touch his penis. The police then found Spies packing up his belongings and he advised them that he had been kicked out of the house by his girlfriend. Spies appeared calm and questioned why they were there. The police asked him to make a statement, but he declined and left.

{¶6} M.R. was taken to Cincinnati Children's Hospital where she revealed that Speis had engaged in a variety of sexual acts with her. She also reported that Speis had told her not to tell anybody. A physical examination disclosed an abrasion in her vagina.

{¶7} In April 2022, the case was tried to a jury. During opening statements, the prosecutor told the jury:

> We'll hear that Officers Taylor and Rees responded to that call [from the neighbor] about the disturbance and encountered [M.R.'s mother] and [grandmother]. We'll hear that by the time that they arrived the Defendant was already packing up his belongings. He had been kicked out of the house by [Mother]. But at first he acted like he had no idea what was going on when they got there. We'll hear that [Mother] and [Grandmother] told the officers what had happened. *They approached the Defendant to make a statement but he declined.*

(Emphasis added.) When the prosecutor finished, the trial court sua sponte questioned whether Speis's Fifth Amendment privilege against self-incrimination had been impinged upon by the prosecutor's comment about Speis's silence. Speis then moved for a mistrial. The court denied the motion and instead gave the jury a limiting instruction.

{¶8} The trial proceeded with the testimony of several witnesses. M.R. testified about the sexual conduct that occurred. Her mother testified about her discovery of the abuse. The two officers mentioned above in opening statements testified that when they arrived Speis was packing up his car and that he soon left. One officer testified that Speis was not arrested that day, was not handcuffed, and that he was free to leave pending further investigation. Speis did not take the stand at trial.

{¶9} Also testifying was Cecelia Freihofer, a social worker and a forensic interviewer at the Mayerson Center at Cincinnati Children's Hospital, where M.R.'s mother had taken her after discovering the sexual abuse. Freihofer conducted a forensic interview with M.R. While she conducted the interview, Freihofer had Mother complete a Traumatic Symptoms Checklist for Young Children (TSCYC). Freihofer explained that the TSCYC

was a screening tool that listed several behaviors potentially indicative of mental stress and asked the parent to identify the behaviors the parent has noticed and their frequency. After the interview, she reviewed the TSCYC with Mother. Based on Mother's responses, the TSCYC was positive for trauma symptoms and sexual concerns. Freihofer found that what M.R. told her during the interview was consistent with inappropriate sexual contact and indicated abuse. Freihofer recommended that Mother seek mental health treatment for M.R. Freihofer summarized her findings in a written "Report of Suspected Child Abuse" for the Mayerson Center, which was admitted into evidence.

{¶10} Freihofer testified about her extensive training and experience and explained how forensic interviews at the Mayerson Center were conducted. She recounted what M.R. told her about the abuse and found that it was consistent with inappropriate sexual contact and indicated abuse. Concerning the TSCYC, Freihofer testified that it was not a diagnostic tool and was not made part of M.R.'s medical record. Rather, it was simply a screening tool that could indicate if further mental health treatment would be beneficial. Freihofer said that the TSCYC was only one piece of information that she used in her recommendations for follow-up care. She was clear that she did not diagnose M.R. as being traumatized, nor did she use the TSCYC to conclude that M.R. was definitively positive for trauma symptoms and sexual concerns. Freihofer noted that there have been many occasions where the TSCYC was negative for trauma symptoms and sexual concerns and that she still recommended follow-up mental health treatment. In this case, said Freihofer, based on her interview with M.R., she would have made the same recommendation for follow-up mental health treatment regardless of what the TSCYC showed.

{¶11} The jury found Speis guilty on all counts. The trial court sentenced him to a total of 20 years in prison and designated him as a Tier II sex offender.

{¶12} Speis now appeals his conviction raising two assignments of error.

## II. Analysis

{¶13} Speis first challenges the denial of his motion for a mistrial and then, secondly, challenges the admission of Freihofer's testimony.

### A. The denial of Speis's motion for a mistrial

{¶14} The first assignment of error alleges:

{¶15} THE TRIAL COURT ERRED BY FAILING TO GRANT A MISTRIAL AFTER THE PROSECUTOR, DURING OPENING STATEMENT AND WITHOUT ANY REASONABLE JUSTIFICATION, COMMENTED UPON APPELLANT'S INVOCATION OF HIS CONSTITUTIONAL RIGHTS TO COUNSEL AND AGAINST SELF-INCRIMINATION.

{¶16} The Fifth Amendment states that "[n]o person * * * shall be compelled in any criminal case to be a witness against himself." Fifth Amendment to the U.S. Constitution. Speis contends that the prosecutor's comment in opening statements on his pre-arrest silence improperly impinged on his Fifth Amendment privilege against self-incrimination. The state agrees that the comment was improper but argues that it was harmless. We disagree that the comment was improper.

{¶17} Our conclusion is based on *Salinas v. Texas*, 570 U.S. 178, 133 S.Ct. 2174 (2013), in which a plurality of the U.S. Supreme Court held that the use of a defendant's pre-arrest, pre-*Miranda* silence as substantive evidence of guilt does not violate the Fifth Amendment privilege against self-incrimination if the defendant fails to expressly invoke the privilege. In *Salinas*, the defendant agreed to accompany the police to the station for questioning. There was no dispute that the interview was noncustodial and that the defendant was not read *Miranda* warnings. The Court described what happened during the interview:

> For most of the interview, petitioner answered the officer's questions. But when asked whether his shotgun "would match the shells recovered at the scene of the murder," * * * petitioner

declined to answer. Instead, petitioner "[l]ooked down at the floor, shuffled his feet, bit his bottom lip, cl[e]nched his hands in his lap, [and] began to tighten up." * * * After a few moments of silence, the officer asked additional questions, which petitioner answered.

*Salinas* at 182. The defendant did not testify at trial. Over the defendant's objection, the prosecutor used the defendant's reaction to the officer's question during the interview as substantive evidence of guilt. The Court held that the defendant's silence could be used as evidence against him because he did not clearly and unambiguously invoke his Fifth Amendment right to remain silent. Therefore, the defendant's Fifth Amendment claim failed "because he did not expressly invoke the privilege against self-incrimination in response to the officer's question." *Id.* at 181.

{¶18} The Court explained that the Fifth Amendment has an "express invocation requirement." *Id.* at 183. The "general rule" is that "a witness must assert the privilege to subsequently benefit from it." *Id.* at 186. Silence is not sufficient to invoke the privilege. The express invocation requirement is subject to only two exceptions. *Id.* at 183. The first is that a defendant need not take the stand at trial and assert the privilege. *Id.* at 184. And the second is when the circumstances of the questioning are coercive (e.g., custodial interrogation). *Id.* at 185. The "critical question," said the Court, is "whether, under the 'circumstances' of this case, [the defendant] was deprived of the ability to voluntarily invoke the Fifth Amendment." *Id.* at 186. "So long as police do not deprive a witness of the ability to voluntarily invoke the privilege, there is no Fifth Amendment violation." *Id.* at 191. The Court pointedly stated that "the Fifth Amendment guarantees that no one may be 'compelled in any criminal case to be a witness against himself'; it does not establish an unqualified 'right to remain silent.'" *Id.* at 189.

{¶19} The coercion exception did not apply to the defendant in *Salinas* because it was undisputed that his interview with police was voluntary. He agreed to accompany the

officers to the station and was free to leave at any time. Because the defendant did not expressly invoke his Fifth Amendment privilege, there was no violation. *See Abby v. Howe*, 742 F.3d 221, 228 (6th Cir.2014) (acknowledging that *Salinas* "held that prosecutors may use a defendant's pre-arrest silence as substantive evidence of his guilt if the defendant did not expressly invoke his right to remain silent"); *State v. Horwitz*, 191 So.3d 429, 440 (Fla.2016) (stating that *Salinas* permits pre-arrest silence to be used as substantive evidence of a defendant's guilt).

{¶20} Here, the state relied upon an earlier Ohio Supreme Court decision, *State v. Leach*, 102 Ohio St.3d 135, 2004-Ohio-2147. In that case, the state presented testimony from a police officer that the defendant had left him a message saying that he wanted to speak with an attorney before talking to the police. The prosecutor referred to the defendant's pre-arrest silence during opening arguments as well. The defendant did not testify at trial. The state argued that this evidence was admissible as substantive evidence of guilt.

{¶21} The question before the *Leach* Court was whether the Fifth Amendment was violated with the admission of testimony that a defendant, who had not yet been arrested or *Mirandized*, remained silent and/or asserted his right to counsel in the face of questioning by law enforcement. The Court noted that whether the admission of such evidence violates the Fifth Amendment was a question that the U.S. Supreme Court has not answered. The Supreme Court "has not yet addressed the issue of whether a defendant's pre-arrest, pre-*Miranda* silence may be used as *substantive* evidence of guilt in the state's case-in-chief." (Emphasis sic.) *Id.* at ¶ 20.

{¶22} Using a two-pronged Fifth Amendment analysis, the Court concluded that the substantive use of the defendant's pre-arrest, pre-*Miranda* silence subverts the policies behind the Fifth Amendment privilege against self-incrimination and is not a legitimate

governmental practice." *Id.* at ¶ 37. Thus the Ohio Supreme Court held that the "use of a defendant's pre-arrest silence as substantive evidence of guilt violates the Fifth Amendment privilege against self-incrimination." *Id.* at ¶ 38.

{¶23} *Leach*, though, is factually distinguishable from the case before us and from *Salinas*. The silence of the *Leach* defendant came after a reference to his right to counsel. But Speis was completely silent, as was the *Salinas* defendant. Thus, *Leach* applies in the case of a defendant not yet been arrested or *Mirandized* who asserted his right to counsel in the face of questioning by law enforcement. But *Salinas* applies in a case, like the present one, where, in the face of questioning, a defendant remained completely silent.

{¶24} Here, as the prosecutor said in opening statements, officers approached Speis to see if he wanted to make a statement, but he declined. There is no evidence even suggesting that Speis invoked his Fifth Amendment privilege against self-incrimination at that time. As *Salinas* taught, Speis's silence was not sufficient. Moreover, the circumstances of the police officers' question were not coercive. Speis was not deprived of the ability to voluntarily invoke the Fifth Amendment, as there is no allegation or evidence that his failure to assert the privilege was involuntary. The state could have used Speis's silence as substantive evidence of his guilt without a Fifth Amendment problem. Therefore, by merely referring to his silence during opening statements, the prosecutor did not improperly impinge Speis's Fifth Amendment privilege against self-incrimination.

{¶25} The first assignment of error is overruled.

### B. Freihofer's testimony

{¶26} The second assignment of error alleges:

{¶27} THE TRIAL COURT ERRED BY ALLOWING THE STATE TO ELICIT EXPERT TESTIMONY FROM CECILIA FREIHOFER DESPITE THE ABSENCE OF AN EXPERT REPORT AND DEMONSTRABLE NON-COMPLIANCE WITH OHIO CRIM.R.

16(K).

**{¶28}** Speis argues that the state failed to provide him with a copy of the TSCYC, on which Freihofer's assessment was based in part, which he says was a violation of the discovery rule in Crim.R. 16(K). Speis contends that the failure to provide the TSCYC rendered it impossible for him to meaningfully confront Freihofer or her opinions, so the testimony should have been excluded.

**{¶29}** Crim.R. 16(K) provides that any expert witness must "prepare a written report summarizing the expert witness's testimony, findings, analysis, conclusions, or opinion, and shall include a summary of the expert's qualifications" and that the report must be timely disclosed to the opposing party. "Failure to disclose the written report to opposing counsel shall preclude the expert's testimony at trial." Crim.R. 16(K).

**{¶30}** The trial court permitted Freihofer to testify as a lay witness. Evid.R. 701 governs opinion testimony by lay witnesses and provides that such testimony "is limited to those opinions or inferences which are (1) rationally based on the perception of the witness and (2) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue." "A trial court has considerable discretion in admitting the opinion testimony of lay witnesses." (Citation omitted.) *State v. Marshall*, 191 Ohio App.3d 444, 2010-Ohio-5160, ¶ 43 (2d Dist.).

**{¶31}** The Ohio Supreme Court has said that lay opinions may be based on the witness's training and experience:

> [C]ourts have permitted lay witnesses to express their opinions in areas in which it would ordinarily be expected that an expert must be qualified under Evid.R. 702. * * * Although these cases are of a technical nature in that they allow lay opinion testimony on a subject outside the realm of common knowledge, they still fall within the ambit of the rule's requirement that a lay witness's opinion be rationally based on firsthand observations and helpful in determining a fact in issue. These cases are not based on specialized knowledge within the scope of Evid.R.

702, but rather are based upon a layperson's personal knowledge and experience.

*State v. McKee*, 91 Ohio St.3d 292, 296-297 (2001). Thus, for example, "[i]t is well-settled that a police officer may testify concerning matters that are within his experience and observations that may aid the trier of fact in understanding the other testimony pursuant to Evid.R. 701." *State v. Tatum*, 10th Dist. Franklin No. 10AP-626, 2011-Ohio-907, ¶ 17. *See also State v. Bowling*, 12th Dist. Butler No. CA2013-08-159, 2014-Ohio-1690, ¶ 14 (officer's training and experience permitted him to testify as to what chemicals are used to manufacture methamphetamine). Also, relevant here, "[s]ocial workers are permitted to testify to their disposition in an alleged sexual abuse case." *State v. Schentur*, 8th Dist. Cuyahoga No. 108448, 2020-Ohio-1603, ¶ 48. But the social worker may not testify as to the veracity of the victim or whether the crime occurred. *Id.* at ¶ 50.

**{¶32}** Here, Freihofer testified that what M.R. told her during the interview was "consistent with sexual contact and concerning for sexual abuse" and that the TSCYC was "positive for trauma symptoms and sexual concerns." Based on this information, Freihofer recommended mental health services. She did not testify that sexual contact in fact occurred but merely that the sexual contact as described by eight-year-old M.R. was inappropriate and suggested abuse.

**{¶33}** We find that this testimony was well within Freihofer's personal knowledge and experience. Freihofer was a social worker and a forensic interviewer at the Mayerson Center, where she had worked for over 15 years. She testified that she has had ongoing training in forensic interviewing and has conducted well over 3,500 forensic interviews. Freihofer's testimony was rationally based on her training and personal experience in child-abuse cases and aided the trier of fact in determining M.R.'s credibility. The trial court reasonably admitted her testimony as lay opinion under Evid.R. 701. Therefore, Crim.R.

16(K) did not apply.

{¶34} Even if Freihofer were an expert witness, she prepared a written report that was disclosed to Speis. Her "Report of Suspected Child Abuse" (State's Exhibit 2) summarizes her "testimony, findings, analysis, conclusions, or opinion" as required by Crim.R. 16(K). It is true that the report does not include "a summary of the expert's qualifications." Crim.R. 16(K). But Speis fails to show that this was a willful violation of the rule, that knowing Freihofer's qualifications would have benefited him in the preparation of his defense, or that he suffered prejudice. *See State v. Joseph*, 73 Ohio St.3d 450, 458 (1995) ("Prosecutorial violations of Crim.R. 16 are reversible only when there is a showing that (1) the prosecution's failure to disclose was a willful violation of the rule, (2) foreknowledge of the information would have benefited the accused in the preparation of his defense, and (3) the accused suffered some prejudicial effect").

{¶35} Lastly, regarding Speis's claim that the TSCYC was not disclosed to him, Crim.R. 16(K) does not require that an expert report include the documentary basis for the expert's "testimony, findings, analysis, conclusions, or opinion." Indeed, we have questioned whether Crim.R. 16 requires a TSCYC to be disclosed at all. *State v. Robinson*, 12th Dist. Clermont No. CA2015-01-013, 2015-Ohio-4533, ¶ 23, fn. 1 (12th Dist.) ("Without providing any opinion on the matter, we question whether a TSCYC assessment is required to be disclosed pursuant to Crim.R. 16(B)(3), (B)(4) and (E)(1) as the trial court found. As the state indicated at trial, a TSCYC assessment is not kept as part of the child's medical records and is not used as a diagnostic tool of any kind").

{¶36} Accordingly, we find the trial court did not abuse its discretion by admitting Freihofer's testimony. The second assignment of error is overruled.

### III. Conclusion

{¶**37**} Having overruled both the assignments of error presented, we the affirm trial court's judgment.

S. POWELL, P.J., and M. POWELL, J., concur.