Filed 1/21/14  P. v. Holmes CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D062866 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. SCD185143) |
| TAMIR BILAL HOLMES, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of San Diego County, Frederick L. Link, Judge.  Affirmed with directions.

Russell S. Babcock, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Eric A. Swenson and Laura A. Glennon, Deputy Attorneys General, for Plaintiff and Respondent.

Tamir Bilal Holmes appeals a judgment following his jury conviction on three counts of committing a lewd act on a child under the age of 14 years (Pen. Code, § 288, subd. (a)).[1] On appeal, Holmes contends: (1) the trial court prejudicially erred by instructing with CALCRIM No. 318 that evidence of a witness's statements before trial could be used as evidence of the truth of the information in those statements; and (2) the abstract of judgment must be corrected to show his sentence is to run concurrently with his West Virginia prison term.[2] Because we conclude the trial court's instructional error was not prejudicial, we affirm the judgment.

FACTUAL AND PROCEDURAL BACKGROUND

Kimberly was born in September 1990.[3] In May 2004, she was 13 years old and in the eighth grade. At that time, her parents were in divorce proceedings and she was living with her mother, Laura.[4] Because Laura worked full-time and attended evening classes, Kimberly was often left unsupervised.

On an afternoon in May 2004, Kimberly was standing at a bus stop when Holmes, then 26 years old, approached her. They conversed and exchanged names. When

---

[1] All statutory references are to the Penal Code unless otherwise specified.

[2] In his reply brief, Holmes, citing *Salinas v. Texas* (2013) ___ U.S. ___ [133 S.Ct. 2174, 186 L.Ed.2d 376], withdrew the contention in his opening brief that admission of his pre-arrest, noncustodial silence violated his Fifth Amendment privilege against self-incrimination. We do not consider the merits of that withdrawn contention.

[3] To protect the victim's privacy, we use only her first name.

[4] To protect Kimberly's privacy, we also use only the first names of her parents.

Holmes asked her how old she was, Kimberly replied she was 15 years old. At trial, Kimberly testified that she lied about her age because she wanted to feel a little older and did not want to appear to be "some stupid little kid." When she asked him how old he was, Holmes replied he was 17 or 18 years old. When he asked her where she lived, she told him she lived a few blocks away and pointed in the direction of her home. Holmes asked her for her telephone number and she gave it to him. Holmes told her he would call her. She then told him she had to leave.

*Count 1*. About one week later, after Kimberly returned from Florida for her father's graduation, Holmes called her and they agreed to meet at a nearby park on a later day. On that day, Holmes walked up to Kimberly at the park and gave her a hug. They walked to his car, a black Cadillac, got in, and drove to his apartment. They went into his bedroom, sat on his bed, and watched television. They talked and then kissed. Kimberly was really nervous because she had never kissed a boy before and was a virgin. Holmes grabbed her stomach and pulled her closer to him. He touched her breast. He fiddled around with the button on her pants and asked her if she wanted to have sex. She replied, "No." However, he kept kissing her and trying to take off her pants. She continued telling him she did not want to have sex, but he insisted. She finally said yes because she did not know what else to do. Holmes then put on a condom, took off Kimberly's pants, and got on top of her. When she told him she was a virgin, he told her he would go slow. He then put his penis in her vagina. Kimberly felt a lot of pain and told him so. Holmes replied that he would slow down. When the pain continued, she again told him about the pain. Holmes got off of her, they dressed, and he drove her home. On the way home,

3

Holmes told her he would call her. He also told her she should not tell anyone because he was 18 years old and could get in a lot of trouble.

*Count 2*. A few days later, Holmes called Kimberly again. They met and drove in his car back to his apartment. They went to his bedroom and kissed. When Holmes asked her if she wanted to have sex, she agreed and they had sexual intercourse. Afterward, he asked her if she was hungry and she said, "Yes." Holmes went out and returned with a burrito, of which she ate a little bit. She then asked him to take her home, which he apparently did.

*Count 3*. After Kimberly did not hear from Holmes for a while, she called him but no one answered. She then went to his apartment and Holmes's mother came out and told her he was at a dentist appointment. Kimberly went home. Later, Holmes called her and they agreed to meet again. He picked her up in his car and then drove to his apartment. They went to his bedroom and had sexual intercourse. Afterward, Holmes told her he did not want her to get pregnant and that she should go on birth control. She replied that she did not know and would have to speak with her mother. Holmes then drove her home.

*Subsequent events and statements*. On May 28, 2004, during a birthday party for her brother, Kimberly told her maternal aunt she was having sex with someone older than her. She told her aunt about it because she did not like it, wanted it to stop, was too scared to say anything, and did not know how to stop it. Her aunt started crying. Later, Kimberly's aunt apparently told her mother (Laura) about it. When her mother asked her about it, Kimberly told her everything. Her mother started crying and just hugged her.

4

At trial, Laura testified she learned of Kimberly's relationship with Holmes in a different way. She testified that, while driving, she saw Kimberly walking with Holmes and yelled out, "What is going on?" Laura was concerned because Holmes looked about 24 years old. When she turned her car around, Kimberly was then walking by herself. She got in her mother's car and they went home. When her mother asked her about Holmes, Kimberly began to cry and told her that she had been going out with him and he had taken advantage of her sexually. Kimberly told her she did not tell her earlier because she was too frightened of her.

Laura told Kimberly's father, J., about the situation. He told Kimberly he wanted to meet Holmes. When she asked Holmes to meet her father he initially declined, but agreed when she said he could not see her again unless he met her father. J. met Kimberly and Holmes in a mall parking garage. J. estimated Holmes was about 30 years old. J. became angry, and told Holmes how old he appeared. Holmes told him he was 25 years old. When J. asked him whether he knew Kimberly's age, Holmes replied he believed she was 15 years old. J. told him she was 13 years old. Holmes admitted to J. that he had sex with Kimberly. J. apparently told him to never speak to his daughter again.

In June 2004, J. took Kimberly to Planned Parenthood, where she spoke with a registered nurse, Diana Glasner, about birth control. Kimberly told Glasner she was 13 years old and had been sexually active with a 17-year-old male for one month. As a mandated reporter, Glasner later wrote a report regarding suspected child abuse based on

5

the information Kimberly gave her and faxed the report to Child Protective Services (CPS).

San Diego Police Detective Thomas Levenberg eventually received Glasner's CPS report and began an investigation. On June 16, 2004, he interviewed Kimberly in person. Kimberly told Levenberg how her relationship with Holmes began and what transpired. She told him she had a sexual relationship with an older male, but was not seeing him anymore. Viewing a "six-pack" photographic lineup Levenberg presented, Kimberly positively identified Holmes as the male with whom she had sex. Kimberly also showed Levenberg the location of Holmes's apartment, only about eight to 10 blocks from her home.

On August 3, 2004, Levenberg and another detective, Dan Schmitt, went to Holmes's apartment. Holmes answered the door and invited them inside. However, when they introduced themselves as police, he stated he would be more comfortable speaking with them outside. Once outside, Levenberg told Holmes they were there to speak to him about Kimberly and what went on between the two of them. Holmes stated he knew why and that he had already talked with her father and learned she was actually 13 years old. Holmes stated Kimberly had told him she was, or was almost, 18 years old. Holmes asked the detectives whether he was in trouble. In a ruse, Levenberg stated Kimberly was pregnant and he wanted a DNA sample from him. Holmes replied that he wanted to talk to Kimberly or to her parents. He stated he did not know she was pregnant. He never denied having sex with Kimberly or asserted that the baby was not his. Levenberg told Holmes not to have any contact with Kimberly or her parents.

The following day, Levenberg contacted Kimberly and her parents and asked them whether they would allow Kimberly to make a pretext phone call to Holmes in an attempt to obtain an admission from him. After J. expressed concern about such a deceptive method and his wish that Kimberly not speak with Holmes again, apparently no pretext call was made. Levenberg took photographs of Kimberly to show how she appeared in 2004.

On August 27, 2004, a felony complaint was issued charging Holmes with two counts of lewd acts on Kimberly, a child under the age of 14 years (§ 288, subd. (a)). The complaint also alleged that in committing those offenses Holmes had substantial sexual conduct with Kimberly within the meaning of section 1203.066, subdivision (a)(8). However, Holmes apparently was not located and arrested until 2011. In 2012, an amended information was issued charging Holmes with three counts of lewd acts on Kimberly, a child under the age of 14 years (§ 288, subd. (a)). The complaint also alleged that in committing those offenses Holmes had substantial sexual conduct with Kimberly within the meaning of section 1203.066, subdivision (a)(8). It also alleged Holmes had one prison prior offense (§§ 667.5, subd. (b), 668).

At trial, the prosecution presented testimony substantially as described above. Holmes did not present any evidence in his defense. The jury found him guilty on all three counts of lewd acts (§ 288, subd. (a)). It also found true the allegations he had substantial sexual conduct with Kimberly in committing the first and third offenses, but not in committing the second offense. The trial court sentenced Holmes to a total term of seven years in prison. The court imposed the middle term of six years for counts one,

two, and three, to be served concurrently, with an additional one-year consecutive term for his prison prior offense. Holmes timely filed a notice of appeal.

DISCUSSION

I

*CALCRIM No. 318*

Holmes contends the trial court prejudicially erred by instructing with CALCRIM No. 318 that evidence of a witness's statements before trial could be used as evidence of the truth of the information in those statements. He asserts that although testimony regarding Kimberly's extrajudicial statements was admissible as nonhearsay, fresh complaint evidence, the information in her extrajudicial statements could not be considered substantively by the jury to prove his guilt of the charged offenses and therefore the court erred by instructing to the contrary with CALCRIM No. 318.

A

Before trial, the prosecution sought admission of testimony by Kimberly's parents regarding extrajudicial statements she made to them under the fresh complaint doctrine. The prosecution argued the testimony was admissible as nonhearsay to show she made a complaint regarding Holmes's conduct and the circumstances surrounding her complaint. Holmes's counsel did not object to the prosecution's motion, and the trial court granted it.

At trial, Laura, J., Glasner, and Levenberg testified regarding certain extrajudicial statements Kimberly made to them. The trial court instructed the jury with CALCRIM NO. 318, as follows:

8

"You have heard evidence of statements that a witness made before the trial. If you decide that the witness made those statements, you may use those statements in two ways:

"1. To evaluate whether the witness's testimony in court is believable; [¶] AND

"2. As evidence [that] the information in those earlier statements . . . is true."

The jury found Holmes guilty on all three counts and found true two of the three allegations regarding substantial sexual conduct.

B

Hearsay evidence is "evidence of a statement that was made other than by a witness while testifying at the hearing and that is offered to prove the truth of the matter stated." (Evid. Code, § 1200, subd. (a).) Hearsay evidence is inadmissible unless there exists an exception to the general exclusionary rule. (Evid. Code, § 1200, subd. (b).)

Under the "fresh complaint" doctrine, a trial court may admit nonhearsay evidence of a complaint made by a victim of a sexual offense. (*People v. Brown* (1994) 8 Cal.4th 746, 749-750 (*Brown*).) *Brown* stated:

"[P]roof of an extrajudicial complaint, made by the victim of a sexual offense, disclosing the alleged assault, may be admissible for a limited, nonhearsay purpose--namely, to establish the fact of, and the circumstances surrounding, the victim's disclosure of the assault to others--whenever the fact that the disclosure was made and the circumstances under which it was made are relevant to the trier of fact's determination as to whether the offense occurred." (*Brown*, *supra*, 8 Cal.4th at pp. 749-750.)

Evidence of a fresh complaint may be relevant because "the circumstances under which the complaint was made may aid the jury in determining whether the alleged offense

9

occurred. Furthermore, admission of evidence that such a prompt complaint was made also will eliminate the risk that the jury, if not apprised of that fact, erroneously will infer that no such prompt complaint was made." (*Brown*, *supra*, 8 Cal.4th at p. 761.) However, the fresh complaint evidence should be "carefully limited to the fact that a complaint was made, and to the circumstances surrounding the making of the complaint, thereby eliminating or at least minimizing the risk that the jury will rely upon the evidence for an impermissible hearsay purpose . . . ." (*Id*. at p. 762.) "Caution in this regard is particularly important because, if the details of the victim's extrajudicial complaint are admitted into evidence, even with a proper limiting instruction, a jury may well find it difficult not to view these details as tending to prove the truth of the underlying charge of sexual assault [citation], thereby converting the victim's statement into a hearsay assertion [citation]." (*Id*. at p. 763.) Therefore, *Brown* concluded fresh complaint evidence is admissible if relevant "so long as its probative value outweighs its prejudicial effect. (Evid. Code, § 352.)" (*Id*. at p. 760.)

In *People v. Burton* (1961) 55 Cal.2d 328, at pages 351 to 352, the court stated: "[T]he alleged victim's statement of the nature of the offense and the identity of the asserted offender, without details, is proper. (E.g., *People v. Adams* (1928), 92 Cal.App. 6, 16 . . . ['that appellant had "ruined her" ']; . . . *People v. Lopez* (1917), 33 Cal.App. 530, 534 . . . ['that she had had sexual intercourse with her father']; [citation].)" In *Burton*, the victim's testimony that her stepfather " 'made me play with his peter' " was permissible as a statement of the fact of molestation. (*Id*. at pp. 337, 351; see also *People v. Cordray*

10

(1963) 221 Cal.App.2d 589, 594 [" 'he had pulled her pants down and he had kissed her between the legs' "].)

On appeal, we apply the de novo, or independent, standard in reviewing whether a trial court erred in instructing the jury. (*People v. Hamilton* (2009) 45 Cal.4th 863, 948; *People v. Berryman* (1993) 6 Cal.4th 1048, 1089.)

C

Holmes asserts the trial court erred by instructing with CALCRIM No. 318 that evidence of a witness's (e.g., Kimberly's) statements before trial could be used as evidence of the truth of the information in those statements (e.g., to substantively prove his guilt of the charged offenses) because fresh complaint evidence cannot be used for that purpose. The People concede, and we agree, the trial court erred by so instructing the jury.[5] *Brown* stated: "[P]roof of an extrajudicial complaint, made by the victim of a sexual offense, disclosing the alleged assault [i.e., fresh complaint evidence], may be admissible for a limited, nonhearsay purpose--namely, to establish the fact of, and the circumstances surrounding, the victim's disclosure of the assault to others--whenever the fact that the disclosure was made and the circumstances under which it was made are relevant to the trier of fact's determination as to whether the offense occurred." (*Brown*, *supra*, 8 Cal.4th at pp. 749-750.) Therefore, the trial court should have modified its

_____

5     However, the People assert Holmes waived any instructional error by not objecting to it below. We choose to address the merits of his contention because there is no waiver of instructional error if it affects Holmes's substantial rights (i.e., if it is reasonably probable he would have obtained a more favorable result absent the instructional error). (§ 1259; *People v. Dunkle* (2005) 36 Cal.4th 861, 929.)

11

CALCRIM No. 318 instruction to state that Kimberly's extrajudicial statements could be used only "[t]o evaluate whether the witness's testimony in court is believable." To the extent the court instructed that those statements could also be used "[a]s evidence that the information in those earlier statements is true," it erred.

D

Nevertheless, we conclude the trial court's instructional error was harmless under the applicable state standard for prejudicial error. Contrary to Holmes's assertion, the court's instructional error did not violate his Sixth Amendment right of confrontation or his Fourteenth Amendment rights to due process and a fair trial. The Sixth Amendment to the United States Constitution provides that "[t]he accused shall enjoy the right . . . to be confronted with the witnesses against him . . . ." In *Crawford v. Washington* (2004) 541 U.S. 36, the Supreme Court held that under the Sixth Amendment testimonial statements of witnesses absent from trial are admissible only where the declarant is unavailable and where the defendant has had a prior opportunity to cross-examine the declarant. (*Id*. at p. 59.) *Crawford* noted: "[W]hen the declarant appears for cross-examination at trial, the Confrontation Clause places no constraints at all on the use of his prior testimonial statements. [Citation.] . . . *The Clause does not bar admission of a statement so long as the declarant is present at trial to defend or explain it*." (*Id*. at p. 59, fn. 9, italics added.) In the circumstances of this case, the Sixth Amendment right of confrontation therefore did *not* preclude admission of Kimberly's extrajudicial statements because she was present at trial and available for cross-examination by the defendant regarding those statements. (Cf. *People v. Green* (1971) 3 Cal.3d 981, 989-990 [no Sixth

12

Amendment violation where witness was recalled for further cross-examination regarding his extrajudicial statements].)

Holmes asserts his Sixth Amendment right was violated because Kimberly's extrajudicial statements were not offered during her testimony on direct examination by the prosecutor, thereby improperly requiring him to recall her later for cross-examination. However, in support of that assertion, he cites only one pre-*Crawford* case from a foreign jurisdiction (i.e., *Felix v. State* (Nev. 1993) 849 P.2d 220, 247). We are not persuaded by that case or Holmes's argument and conclude the Sixth Amendment right of confrontation does not require the prosecution to present a witness's extrajudicial statements before or during direct examination of the declarant. Under *Crawford*, the Sixth Amendment right of confrontation does not bar admission of extrajudicial testimonial statements if the declarant is present at trial and available for cross-examination by the defendant regarding those statements. (*Crawford v. Washington*, *supra*, 541 U.S. at p. 59, fn. 9.) Although Kimberly testified on direct examination before other witnesses testified regarding her extrajudicial statements (i.e., Laura, J., Glasner, and Levenberg), she was present at trial and Holmes had the opportunity to later recall and cross-examine her regarding those extrajudicial statements. In addition, Holmes was alerted to the substance of the later testimonies of witnesses regarding her extrajudicial statements during the pretrial in limine motions. The fact Holmes did not avail himself of that opportunity did not deprive him of his right of confrontation under the Sixth Amendment. Therefore, the trial court's error did not violate Holmes's Sixth Amendment right of confrontation.

13

Holmes also does not persuade us the court's instructional error violated his Fourteenth Amendment rights to due process and a fair trial. The instructional error did not deprive him of a fundamentally fair trial or so infuse the trial with unfairness as to deny him due process of law. (*Estelle v. McGuire* (1991) 502 U.S. 62, 75.) In our view, an instruction allowing the jury to consider fresh complaint evidence as hearsay to prove the truth of the matter stated (e.g., to substantively prove Holmes's guilt of the charged offenses) is not so egregious as to violate a defendant's federal constitutional rights to due process and a fair trial.

Because Holmes does not show the trial court's instructional error violated a federal constitutional right, we apply the state standard rather than the federal standard in determining the prejudicial effect of that error. Under the state standard for prejudicial error, the defendant has the burden on appeal to show it is reasonably probable he or she would have obtained a more favorable outcome absent the error. (*People v. Watson* (1956) 46 Cal.2d 818, 836.) In contrast, under the federal standard for prejudicial error, the error is deemed prejudicial unless the government meets its burden on appeal to show the error was harmless beyond a reasonable doubt. (*Chapman v. California* (1966) 386 U.S. 18, 24.) In this context, "probability" does not mean more likely than not, but merely a reasonable chance and more than an abstract possibility. (*Cassim v. Allstate Ins. Co.* (2004) 33 Cal.4th 780, 800; *Richardson v. Superior Court* (2008) 43 Cal.4th 1040, 1050.) In the context of instructional error, the California Supreme Court has suggested certain factors for appellate courts to consider in determining an erroneous instruction's prejudicial effect. (*LeMons v. Regents of University of California* (1978) 21 Cal.3d 869,

14

876.) *LeMons* stated: "While there is no precise formula for measuring the effect of an erroneous instruction [citation], a number of factors are considered in measuring prejudice: (1) the degree of conflict in the evidence on critical issues [citations]; (2) whether respondent's argument to the jury may have contributed to the instruction's misleading effect [citation]; (3) whether the jury requested a rereading of the erroneous instruction [citation] or of related evidence [citation]; (4) the closeness of the jury's verdict [citation]; and (5) the effect of other instructions in remedying the error [citations]." (*Ibid.*)

Considering the *LeMons* factors and applying the *Watson* standard of prejudice based on our review of the record in this case, we conclude the trial court's error by instructing with CALCRIM No. 318 that evidence of Kimberly's extrajudicial statements could be used as evidence of the truth of the information in those statements (i.e., to substantively prove Holmes's guilt) was harmless. On the first *LeMons* factor, there was little, if any, conflict in the evidence on the critical issues in this case. Kimberly testified that Holmes had sexual intercourse with her on three occasions. The testimonies of Laura, J., Glasner, and Levenberg regarding Kimberly's extrajudicial fresh complaints to them could, and presumably was, considered by the jury as corroboration of her trial testimony. To the extent the jury may have considered their testimony regarding Kimberly's extrajudicial statements as substantive proof of Holmes's guilt (per the trial court's erroneous CALCRIM No. 318 instruction), that evidence was cumulative to other more direct proof of his guilt (i.e., Kimberly's trial testimony). There was no significant conflict in the evidence on the issue of whether Holmes had sexual intercourse with

15

Kimberly on three occasions. Although Kimberly did not testify in a manner that gave extensive details differentiating each occasion of lewd acts, the lack of differentiating details did not show a conflict in the evidence. Rather, it likely showed, at most, that on each occasion Holmes followed a similar pattern in having sexual intercourse with Kimberly.

Furthermore, the insignificant discrepancies in the testimonies of various witnesses regarding events occurring eight years before the trial does not show there was a conflict in the evidence on the main issue in this case (i.e., whether Holmes engaged in sexual intercourse with Kimberly on three occasions). For example, Holmes notes that Kimberly testified she went to Planned Parenthood for a health check-up, whereas J. testified she went there for birth control. Holmes also notes Kimberly testified she told Laura about her sexual relationship with him after she told her aunt about it, and Laura testified Kimberly told her about that relationship before then. None of the discrepancies cited by Holmes constitutes a significant conflict in the evidence on the major issues in this case. The discrepancies do not show Kimberly's testimony was not credible or that the three occasions of her sexual intercourse with Holmes did not occur. Also, the fact that the jury found Holmes had substantial sexual conduct with Kimberly on only two of three occasions of sexual intercourse (or other lewd acts) does not show the jury found her testimony incredible or would have found him not guilty on the second count had the trial court correctly instructed the jury on the proper use of fresh complaint evidence.

On the second *LeMons* factor, the prosecutor's closing argument likely had little, if any, effect on the jury's consideration and/or application of the court's erroneous

16

instruction and the ultimate outcome in this case.  As Holmes notes, the prosecutor's closing argument included a restatement of the trial court's erroneous CALCRIM No. 318 instruction.  However, in arguing the weight of the evidence, the prosecutor relied primarily on Kimberly's trial testimony and argued the jury should "focus on" the credibility of her testimony by considering her trial demeanor and whether she had any motive to lie or fabricate her testimony.  The prosecutor also argued the fresh complaint testimony of other witnesses (i.e., Laura, J., Glasner, and Levenberg) corroborated Kimberly's trial testimony.  To the extent the prosecutor also argued their fresh complaint evidence could be used to substantively prove Holmes's guilt of the charged offenses, she did not emphasize that erroneous use of fresh complaint evidence and we conclude it did not significantly exacerbate the effect of the court's erroneous instruction.

On the third *LeMons* factor, although the jury did not request a rereading (or further explanation) of the erroneous instruction, it did request, and received, rereadings of certain testimony.  The jury requested, and received, rereadings of the testimonies of Kimberly, Laura, and Levenberg.  Contrary to Holmes's assertion, we conclude the jury's requests for rereadings of their testimonies do not show it "struggled to decide this case," but rather that it was carefully evaluating the evidence to reach a verdict.  The jury also asked to review Glasner's exam and Levenberg's report.  The trial court denied those requests.  No prejudice because of the court's erroneous CALCRIM No. 318 instruction can be reasonably inferred from the jury's requests.

On the fourth *LeMons* factor, the record does not show the jury's verdict was close.  Although the jury deliberated for about six hours, much of that time was spent sending

17

notes to the trial court, waiting for the court's responses, and listening to rereadings of witness testimony. Given the fact the jury had to consider three counts of lewd acts and three allegations of substantial sexual conduct related to those counts, we conclude the length of the jury's deliberations does not show its verdict was close. The fact the prosecution's case took only about three hours does not show the jury's verdict was close, even when comparing the length of the trial to the length of the jury's deliberations. The fact the jury asked the court for guidance on the allegations of substantial sexual conduct did not show the jury's verdict was close. The jury asked the court whether it must be unanimous in its findings of substantial sexual conduct, and whether it could be hung on that allegation but unanimously find Holmes guilty on the three counts of lewd acts. Those questions did not indicate the jury was close on the issue of Holmes's guilt on the charged offenses. The jury's not true finding on the allegation Holmes had substantial sexual conduct with Kimberly in committing the second lewd act does not show it had difficulty in reaching a guilty verdict on the second count. Rather, it likely shows the jury carefully considered the evidence in reaching its verdicts. (Cf. *People Villanueva* (2008) 169 Cal.App.4th 41, 54.)

On the fifth and final *LeMons* factor, at least one other jury instruction tended to remedy or mitigate the effect of the court's instructional error. The trial court instructed with CALCRIM No. 226 on how it should evaluate the credibility of a witness. It instructed the jury that it could believe all, part, or none of a witness's testimony. It instructed that one factor in determining a witness's credibility was whether the witness had made a statement in the past consistent or inconsistent with his or her testimony. We

18

believe the court's instruction with CALCRIM No. 226 aided the jury in focusing on the credibility of Kimberly's trial testimony, thereby minimizing any prejudicial effect of the court's error in instructing with CALCRIM No. 318 that it could consider her extrajudicial statements as substantive proof of Holmes's guilt.

Considering the above *LeMons* factors, we believe the jury's verdict was likely based on its careful evaluation of the credibility of Kimberly's trial testimony, corroborated by her fresh complaints made shortly after the three incidents. Furthermore, the jury likely considered the evidence showing Holmes did not deny to Levenberg his sexual conduct with Kimberly and did not deny involvement in her purported pregnancy. Also, according to Levenberg, J. told him Holmes admitted to him (J.) that he had sex with Kimberly. Based on our review of the record, we conclude it is not reasonably probable Holmes would have obtained a more favorable result had the trial court not erroneously instructed with CALCRIM No. 318 that evidence of a witness's statements before trial could be used as evidence of the truth of the information in those statements (e.g., to substantively prove his guilt of the charged offenses). The court's instructional error was harmless and does not require reversal of the judgment. (*People v. Watson*, *supra*, 46 Cal.2d at p. 836.)

II

*Abstract of Judgment*

Holmes contends, and the People agree, the abstract of judgment must be amended to accurately reflect the trial court's order that his seven-year prison term is to run concurrently with his West Virginia prison term. The reporter's transcript from the

sentencing hearing shows the trial court stated: "I'm going to order that this [seven-year term] shall run *concurrent* to any sentence that he shall receive in West Virginia." (Italics added.) The court's minutes likewise show it ordered the "[s]entence on this case is to run *concurrent* with West Virginia sentence." (Italics added.) However, the abstract of judgment erroneously indicates that Holmes's sentence is to run consecutive to his West Virginia prison term. The abstract of judgment must be amended to correctly reflect the trial court's judgment that his seven-year prison term is to run concurrently with his West Virginia prison term.

### DISPOSITION

The judgment is affirmed. The matter is remanded to the trial court with directions that it prepare an amended abstract of judgment consistent with this opinion and forward a certified copy of the amended abstract of judgment to the Department of Corrections and Rehabilitation.

McDONALD, Acting P. J.

WE CONCUR:

AARON, J.

IRION, J.

20