NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
### DIVISION ONE

STATE OF ARIZONA, *Appellee*,

*v.*

ARNOLDO CASTILLO, *Appellant*.

No. 1 CA-CR 20-0029
FILED 12-15-2020

Appeal from the Superior Court in Maricopa County
No. CR2019-005021-001
The Honorable Laura Johnson Giaquinto, Judge *Pro Tempore*

**AFFIRMED**

COUNSEL

Arizona Attorney General's Office, Phoenix
By Joshua C. Smith
*Counsel for Appellee*

Maricopa County Public Defender's Office, Phoenix
By Kevin D. Heade
*Counsel for Appellant*

---

## MEMORANDUM DECISION

Judge Paul J. McMurdie delivered the Court's decision, in which Presiding Judge James B. Morse Jr. and Judge Maria Elena Cruz joined.

---

**M c M U R D I E**, Judge:

**¶1**	Arnoldo Castillo appeals his convictions and sentences for two counts of aggravated driving under the influence ("DUI"). He argues the prosecutor erred[1] in a manner that affected the verdicts. He further contends the superior court erred by admitting law-enforcement testimony that lacked adequate foundation and by precluding a witness he untimely disclosed. For the following reasons, we affirm.

### FACTS[2] AND PROCEDURAL BACKGROUND

**¶2**	Late on New Year's Eve in 2014, Richard[3] and his wife traveled southbound on the I-17 freeway when they saw a white vehicle coming towards them, driving the wrong way. Richard immediately called 9-1-1. As the car passed them, Richard saw that a male was driving.

**¶3**	Minutes after receiving Richard's 9-1-1 call, troopers with the Arizona Department of Public Safety ("DPS") found the car crashed near a freeway-exit ramp. Castillo, the registered owner of the vehicle, stood next to the car. At the trial, Richard identified the vehicle as the car he had seen on New Year's Eve.

---

[1]	Castillo does not argue, and we do not separately find, that any prosecutorial misconduct committed here also equated to professional or ethical misconduct by the prosecutor. *See In re Martinez*, 248 Ariz. 458, 469-70, ¶¶ 42-47 (2020). Therefore, we refer to the claims as prosecutorial error.

[2]	We view the evidence in the light most favorable to upholding the verdicts and resolve all reasonable inferences against Castillo. *State v. Mendoza*, 248 Ariz. 6, 11, ¶ 1, n.1 (App. 2019).

[3]	To protect the witness's identity, we refer to him by a pseudonym.

¶4         After noticing that Castillo showed signs and symptoms consistent with alcohol consumption, Sergeant Jones asked Castillo if he had been drinking alcohol that night. Castillo answered "yeah" and said he was a little drunk. Sergeant Jones next asked Castillo whether he knew he had been driving the wrong way on the freeway, and Castillo responded, "Yeah. Let's get this over with. How long will this take?"

¶5         With Castillo's consent, a trooper performed a horizontal gaze nystagmus ("HGN") test. The trooper observed six out of six cues of HGN, indicating a blood alcohol content ("BAC") of at least 0.08. Sergeant Jones arrested Castillo, gave him *Miranda*[4] warnings, and then drove him to a police station. During the ride, Castillo said to the sergeant, "I made a mistake. Can I go home now?"

¶6         When they arrived at the station, Castillo agreed to take a breath test. The first breath sample revealed that Castillo's BAC at 0.151, and a second sample showed his BAC at 0.139. Pursuant to a warrant, troopers took a blood sample from Castillo. Blood testing later found Castillo's BAC at 0.156.

¶7         A grand jury indicted Castillo on two counts of aggravated DUI, class 4 felonies. On Count 1, the State charged him with driving or being in actual physical control of his car while he was impaired by alcohol to the slightest degree. Count 2 alleged Castillo's BAC was 0.08 or more within two hours of driving or being in actual physical control of the car. Each count further alleged that Castillo had been convicted of two DUI offenses within 84 months of the current offense.

¶8         At the trial, Sergeant Jones testified he asked Castillo at the scene whether he had been driving and recounted Castillo's response. For his part, Castillo testified that he had started drinking alcohol on the day of the accident after working his shift at a restaurant. He testified that his nephew picked him up from work and drove the vehicle when it crashed. He said his nephew fled after the crash because he had outstanding "traffic tickets." Castillo denied telling Sergeant Jones he was driving but admitted he never told any troopers his nephew had been driving. Both Castillo and Castillo's daughter testified that the nephew died in September 2016.

---

4         *Miranda v. Arizona*, 384 U.S. 436 (1966).

¶9        On cross-examination, Castillo again denied telling Sergeant Jones that he had been driving. The prosecutor asked Castillo to clarify the opposing versions of events in the following exchange:

> Q.      But you didn't hear Sergeant Jones testify that he asked you whether or not you knew you were driving the wrong way on the freeway?
>
> A.      He didn't ask me that.
>
> Q.      He didn't?
>
> A.      No.
>
> *      *      *
>
> Q.      So is it your testimony today that Sergeant Jones' testimony regarding the fact that he asked you about driving the wrong way on the freeway was either a lie or misremembered?
>
> A.      He didn't ask me.
>
> Q.      So then Sergeant Jones is a liar, then?
>
> A.      I couldn't say, I don't know.

The prosecutor asked Castillo once more if Sergeant Jones was a "liar." Castillo responded, "I don't know."

¶10        Later during cross-examination, Castillo acknowledged that on the ride to the police station, he told Sergeant Jones he had made a "mistake" and asked if he could "go home." The prosecutor next asked Castillo whether he ever told Sergeant Jones, while Jones took him through all the "intrusive procedures," "steps," and "rigamarole" in the DUI investigation, that he had not been driving. Castillo replied that the troopers never asked him. On redirect examination, Castillo said he would have told the troopers more if they had provided him with an interpreter.

¶11        The superior court later asked Castillo two juror questions about whether the nephew was driving. The first question was, "Did any of your co-workers see your nephew driving away from the restaurant?" Castillo answered, "One person, I'm sure about." The second question was, "Did anyone besides yourself see your nephew driving the car?" Castillo responded, "Just that same person—myself and another person."

¶12      On recross-examination, the prosecutor asked Castillo for the name of the person who saw the nephew driving the car. Castillo said the person was his co-worker, L.M. Castillo explained that L.M. "was the last one to be there when [the nephew] and me left [the restaurant]." After Castillo acknowledged he still stayed in touch with L.M., the following exchange with the prosecutor occurred:

> Q.      You know [L.M.] well?
>
> A.      Yes.
>
> Q.      So where is he today?
>
> A.      I don't know if he's working or if he's at home.
>
> Q.      So he could have come in to testify to all of these things; right?
>
> A.      My attorney didn't let my daughter bring him in to testify.
>
> Q.      That seems like someone who would be pretty important for a trial like this, don't you think?
>
> A.      Ask him.
>
> Q.      So you're blaming your attorney for not calling somebody in today?
>
> A.      No.
>
> Q.      So then why isn't that person here? Couldn't your family have called him?
>
> A.      My attorney didn't want to. He said something to my daughter, I don't know why he couldn't come.

¶13      Later, on recross-examination, the prosecutor asked Castillo, "So [the nephew] wasn't drinking, but he still drove the wrong way, correct?" Castillo answered that his nephew had not driven the wrong way, leading to this exchange:

> Q.      So do you recall hearing testimony from [Richard], the civilian witness in this case, stating that he saw you driving the wrong way for at least 200 feet?

A.     Yes, that causes me—I don't know how to say it—it gets me angry, gets me upset because that young guy just—I can say that he is a liar.

Q.     But so my witness is a liar?

A.     That one, yeah.

¶14     The next day, Castillo's counsel moved to call L.M. to testify. Defense counsel explained L.M. would testify that either (1) Castillo had asked L.M. for a ride that night or (2) L.M. "overheard [Castillo] say that [the nephew] was going to pick him up." Defense counsel acknowledged that L.M. would not testify that he saw the nephew picking Castillo up from work or driving the vehicle. Castillo's counsel informed the court that he had been "notified about [L.M.]" and his anticipated testimony before trial. Still, he had not disclosed L.M. as a witness because his testimony would constitute inadmissible hearsay. Defense counsel explained that he now wanted to call L.M. as a witness to rebut the State's attempt to challenge Castillo's credibility.

¶15     The State objected, citing Castillo's untimely disclosure as a ground for preclusion. The superior court found Castillo's untimely disclosure of L.M. violated Rule 15 of the Arizona Rules of Criminal Procedure and excluded the witness under Rule 15.7(c)(1).

¶16     The jury convicted Castillo as charged. The superior court sentenced him as a category-three repetitive offender to concurrent terms of 10 years' imprisonment. Castillo appealed, and we have jurisdiction under Article 6, Section 9, of the Arizona Constitution, and Arizona Revised Statutes ("A.R.S.") sections 12-120.21(A)(1), 13-4031, and -4033(A)(1).

## DISCUSSION

A. **Castillo Has Not Established That His Convictions Should Be Reversed for Prosecutorial Error.**

¶17     Castillo cites three instances of alleged prosecutorial error when the prosecutor cross-examined him. First, Castillo contends the prosecutor violated due process by commenting on his post-*Miranda* silence to show evidence of guilt. Second, Castillo argues the prosecutor's questions unconstitutionally shifted the burden of proof. Third, Castillo complains that the prosecutor improperly asked him whether the State's witnesses were lying. Finally, Castillo argues the cumulative effect of the separate errors deprived him of a fair trial.

¶18        Because Castillo did not object to any of the cited instances, he has forfeited appellate relief absent fundamental error resulting in prejudice. *See State v. Escalante*, 245 Ariz. 135, 140, 142, ¶¶ 12, 21 (2018). To establish fundamental error, a defendant must first prove the superior court erred and then show that such error (1) went to the foundation of the case, (2) took away a right essential to the defense, or (3) was so egregious that the defendant could not possibly have received a fair trial. *Id.* "If the defendant establishes fundamental error under prongs one or two, he must make a separate showing of prejudice[.]" *Id.* at 142, ¶ 21.

¶19        To prevail on a claim of prosecutorial error, a defendant must show an error and that it was reasonably likely to have affected the jury's verdict and thereby deny the defendant a fair trial. *State v. Moody*, 208 Ariz. 424, 459, ¶ 145 (2004). "The defendant must show that the offending statements were so pronounced and persistent that they permeate[d] the entire atmosphere of the trial and so infected the trial with unfairness as to make the resulting conviction a denial of due process." *State v. Gallardo*, 225 Ariz. 560, 568, ¶ 34 (2010) (alteration in original) (quotations omitted).

### There Was Not a Due-Process Violation Regarding the Admission of Post-*Miranda* Silence.

¶20        A prosecutor violates due process by using a defendant's post-*Miranda* silence as substantive evidence of guilt or impeaching the defendant. *State v. VanWinkle*, 229 Ariz. 233, 237, ¶ 15 (2012). The privilege against self-incrimination is not self-executing, meaning a person "who desires its protection must claim it." *Salinas v. Texas*, 570 U.S. 178, 181 (2013) (quotations omitted). A defendant who voluntarily speaks after being instructed of his or her *Miranda* rights has not remained silent. *Anderson v. Charles*, 447 U.S. 404, 408 (1980). "If a defendant tells different stories during post-arrest questioning and at trial, the prosecution may properly inquire into the prior inconsistent statements, even though the prior statements involve 'silence' insofar as they omit facts contained in the later story." *State v. Guerra*, 161 Ariz. 289, 296 (1989).

¶21        Here, Castillo does not argue, much less establish, that he invoked his right to remain silent. *See State v. Payne*, 233 Ariz. 484, 501, ¶ 40 (2013) ("An invocation of the right to silence must be unequivocal and unambiguous[.]"). To the contrary, Castillo voluntarily spoke to Sergeant Jones after the sergeant read him his *Miranda* rights and told the sergeant that he made a mistake and wanted to return home. Because Castillo made a post-*Miranda* statement that amounted to, at minimum, a partial admission of guilt, the prosecutor was allowed to ask him during the trial

why he did not also tell the troopers about the exculpatory information he recounted on direct examination. *See State v. Tuzon*, 118 Ariz. 205, 207 (1978) ("When one who has voluntarily made statements to police officers after his arrest makes new exculpatory statements at trial, the fact that he failed to make these statements earlier may be used for impeachment.").

**¶22**   Furthermore, the prosecutor never urged the jurors to find Castillo guilty based on his purported silence. Instead, the prosecutor repeatedly cited Castillo's post-*Miranda* statement as an admission of guilt. The prosecutor further argued the jurors should consider Castillo's inculpatory statements to the police, both before and after *Miranda*, to assess Castillo's credibility of the account he provided for the first time at the trial. Moreover, even without the prosecutor's questions or argument, the jurors knew from Castillo's testimony that he did not tell the police that his nephew had been driving. Accordingly, because Castillo did not invoke his right to remain silent and because the prosecutor's comments were not impermissibly directed toward Castillo's exercise of such a right, there was no prosecutorial error.[5]

### The Prosecutor Did Not Engage in Burden-Shifting.

**¶23**   Next, Castillo argues the prosecutor unconstitutionally shifted the burden of proof by asking him why he had not called L.M. as a witness. "When a prosecutor comments on a defendant's failure to present evidence to support his or her theory of the case, it is neither improper nor shifts the burden of proof to the defendant so long as such comments are not intended to direct the jury's attention to the defendant's failure to testify." *State v. Sarullo*, 219 Ariz. 431, 437, ¶ 24 (App. 2008). "Even where the defendant does not take the stand . . . [s]uch comment is permitted by the well recognized principle that the nonproduction of evidence may give rise to the inference that it would have been adverse to the party who could

---

[5]  Contrary to Castillo's argument on appeal, he has the burden under fundamental-error review to establish prejudice in a "fact-intensive inquiry." *See Escalante*, 245 Ariz. at 140, 142, ¶¶ 12, 21. Because Castillo fails to argue, let alone demonstrate, he suffered prejudice from the claimed error, he has waived that argument. *See In re Aubuchon*, 233 Ariz. 62, 64–65, ¶ 6 (2013) ("[W]e consider waived those arguments not supported by adequate explanation, citations to the record, or authority."). Thus, even assuming error occurred, Castillo does not meet his burden to prove prejudice.

have produced it." *State ex rel. McDougall v. Corcoran*, 153 Ariz. 157, 160 (1987).

¶24 Here, because Castillo testified, the prosecutor's inquiry could not direct the jurors' attention to his failure to take the stand. *See Sarullo*, 219 Ariz. at 437, ¶ 24. Also, Castillo failed to object to the jurors' questions regarding the existence of any additional witnesses who could corroborate Castillo's testimony that the nephew drove him from the restaurant. Therefore, the prosecutor did not violate due process by asking Castillo why he did not call L.M. to corroborate his testimony that the nephew drove the vehicle. *See id*.

¶25 We also find no merit in Castillo's contention that the prosecutor's questioning implicitly invited the jurors to speculate about confidential attorney-client communications. In response to cross-examination about his failure to call L.M. to testify, Castillo voluntarily offered that his attorney prevented him from doing so. The prosecutor's brief question to Castillo's unprompted response asking whether Castillo "blamed" his attorney neither suggested to the jurors that they should fault defense counsel nor accused defense counsel of improper conduct. *See supra* ¶ 12. Instead, the questions were directed toward challenging Castillo's credibility and his newly disclosed revelation that he was in close contact with a person who purportedly had exculpatory information. Therefore, there was no prosecutorial error.

### The Questions Of "Were They Lying" Were Not Improper Under the Circumstances.

¶26 Castillo further asserts the prosecutor's "were they lying" questions constituted prosecutorial error requiring reversal. "Were they lying" questions are not categorically prohibited, but parties nonetheless should "refrain from asking such questions." *State v. Morales*, 198 Ariz. 372, 375, ¶ 13 (App. 2000).[6] "[S]uch questions may be appropriate when the only possible explanation for the inconsistent testimony is deceit or lying or when a defendant has opened the door by testifying about the veracity of other witnesses on direct examination." *Id*. "'Were they lying' questions alone will rarely amount to fundamental error." *Id*. at 376, ¶ 15.

¶27 The prosecutor began his inquiry on the topic by allowing Castillo to clarify whether he challenged the sergeant's memory or veracity.

---

[6] We decline Castillo's invitation to revisit *Morales*.

The use of the word "lying" was not so inflammatory in these circumstances that it would unduly affect the jurors' assessment of witness credibility. This is particularly so, given that a reasonable juror could conclude from Castillo's testimony alone that he disputed Sergeant Jones's account's truthfulness, even without the prosecutor's use of the term.

¶28 Likewise, Castillo's argument that the prosecutor improperly asked him to opine on Richard's credibility is unavailing. The prosecutor did not seek to elicit such testimony from Castillo. Instead, Castillo volunteered his opinion that Richard was a liar when the prosecutor asked him merely whether he had heard Richard's testimony. *See supra* ¶ 13. Accordingly, because the prosecutor's brief cross-examination questions on the matter highlighted credibility differences the jury could consider, there was no error.

¶29 We also reject Castillo's contention that the prosecutor engaged in impermissible vouching by asking him a series of questions about whether the State's witnesses had felony convictions. Rule 609 allows the jury to consider a witness's criminal history when assessing credibility. Prosecutorial vouching occurs either "(1) where the prosecutor places the prestige of the government behind its witness; (2) where the prosecutor suggests that information not presented to the jury supports the witness's testimony." *State v. Vincent*, 159 Ariz. 418, 423 (1989). There was no error.

**There Is No Cumulative Effect of Prosecutorial Errors.**

¶30 Finally, Castillo argues the cumulative effect of the prosecutor's alleged errors denied him a fair trial. Because none of the cited instances constituted prosecutorial error, no cumulative error occurred. *See State v. Bocharski*, 218 Ariz. 476, 492, ¶ 75 (2008) ("Absent any finding of misconduct, there can be no cumulative effect of misconduct sufficient to permeate the entire atmosphere of the trial with unfairness."); *State v. Hughes*, 193 Ariz. 72, 79, ¶ 26 (1998) (explaining that alleged prosecutorial error instances are evaluated for cumulative effect).

B. **The Superior Court Did Not Admit Law-Enforcement Testimony That Lacked Proper Foundation.**

¶31 At trial, the prosecutor asked Sergeant Jones, "After speaking with the other troopers who were involved in this case, as well as the on-scene witnesses, did you make a determination as to who the driver was at that point?" Sergeant Jones replied that Castillo was the driver. Later, the prosecutor asked:

Q.     After speaking with eyewitnesses who had observed the collision, notating what the other officers had learned during the investigation, your own personal observations with the defendant, as well as his statements, did you have any reason to believe that anyone other than the defendant was the driver that night?

A.     No, I did not.

¶32     Castillo argues the superior court erred by admitting Sergeant Jones's testimony that he "determined" Castillo was driving the vehicle at the accident scene. Castillo does not claim, nor does the record reveal, that the court admitted any hearsay testimony through Sergeant Jones. Instead, he contends the foundation for the sergeant's testimony came solely from inadmissible hearsay.

¶33     Arizona Rule of Evidence 602 provides: "A witness may testify to a matter only if evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter. Evidence to prove personal knowledge may consist of the witness's own testimony." Because Castillo failed to raise a foundation objection to the testimony, we review only for fundamental, prejudicial error. *See Escalante*, 245 Ariz. at 140, 142, ¶¶ 12, 21.

¶34     Castillo's argument is unpersuasive because, *inter alia*, Castillo *admitted* to Sergeant Jones he was driving the wrong way on the freeway. His admission alone gave Sergeant Jones sufficient foundation to testify he "determined" Castillo was the driver. Furthermore, other items of non-hearsay evidence corroborated Castillo's admission. The troopers saw no one fleeing the scene or otherwise hiding. When troopers first contacted Castillo, he was standing alone next to the vehicle, and it was registered to him. Therefore, the superior court did not err by failing to *sua sponte* strike the challenged testimony for an insufficient foundation.

¶35     Nor does Castillo show prejudice, given Sergeant Jones's later testimony. After the parties had examined Jones, the superior court asked him a juror question: "During your on-scene investigations, did you interview anyone who specifically identified or confirmed Mr. Castillo as the driver of the car that crashed?" Sergeant Jones responded, "No." Because the jurors thus learned that none of the witnesses identified Castillo as the driver, they were left to conclude that Sergeant Jones did not "determine" Castillo was the driver based on statements from non-testifying witnesses that he had heard at the scene.

## C. **The Superior Court Did Not Err by Precluding L.M.'s Testimony.**

¶36  Castillo argues the superior court erred by denying his untimely request to call L.M. as a witness. As an initial matter, Castillo concedes his disclosure of L.M. was untimely. *See* Ariz. R. Crim. P. 15.2(b)(1), (d)(1). He asserts, however, the superior court's decision to preclude L.M.'s testimony was too harsh a sanction, a ruling we review for abuse of discretion. *See State v. Rienhardt*, 190 Ariz. 579, 586 (1997).

¶37  Arizona Rule of Criminal Procedure 15.7 authorizes the superior court to impose sanctions, including preclusion, for a discovery violation. Before excluding evidence as a discovery-violation sanction, a court must determine if "less stringent sanctions can be used" and must consider whether (1) the witness is vital to the proponent's case, (2) the "opposing party will be surprised and prejudiced" by allowing the testimony, (3) the proponent was motivated by bad faith or willfulness, and (4) any other relevant circumstances. *State v. Smith*, 123 Ariz. 243, 252 (1979); *see* Ariz. R. Crim. P. 15.7(c).

¶38  Applying the first *Smith* factor here, L.M.'s testimony was not vital because, according to defense counsel's proffer, L.M. would not have corroborated Castillo's testimony. *Supra* ¶ 14. As defense counsel informed the court, L.M. did not witness the nephew driving the vehicle and would instead testify only about statements he heard, all arguably inadmissible hearsay. Indeed, a reasonable fact-finder could conclude L.M.'s testimony would *damage* Castillo's defense to the extent that it would contradict Castillo's assertion that L.M. saw the nephew driving Castillo's car.

¶39  Under the second *Smith* factor, nothing in the record shows the State was aware of L.M. until Castillo mentioned the existence of an unnamed (and undisclosed) witness when he answered the juror questions. *Supra* ¶¶ 11–12, 14. The answer was near the end of the trial, and the disclosure's late timing surprised and prejudiced the State, which had already completed its cross-examination of Castillo and rested. Although there is no evidence of bad faith, the untimely disclosure was nonetheless willful under the third factor, given that defense counsel repeatedly acknowledged he was aware of L.M.'s anticipated testimony before trial but, citing evidentiary reasons, chose not to disclose him. *See id.* at ¶ 14; *see also State v. Killean*, 185 Ariz. 270, 271 (1996) (explaining preclusion is appropriate when a party engages in "willful misconduct, such as an unexplained failure to do what the rules require").

**¶40** Finally, the superior court expressly considered and rejected less stringent sanctions, finding that neither a continuance nor a mistrial offered an appropriate remedy under the circumstances. *See Smith*, 123 Ariz. at 252. Because the record supports the court's ruling, we find no abuse of discretion.

## CONCLUSION

**¶41** We affirm Castillo's convictions and sentences.



AMY M. WOOD • Clerk of the Court
FILED:  AA