Filed 8/11/22  P. v. Silva CA1/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE,<br><br>      Plaintiff and Respondent,<br>v.<br>JENELLE RENEE SILVA,<br><br>      Defendant and Appellant. | A159074<br><br>(Contra Costa County<br>Super. Ct. No. 5-182401-0) |

Over a period of several years, defendant Jenelle Silva stole approximately $250,000 from her employer by printing checks made out to herself and forging the managing partner's signature on them.  A jury convicted her of felony counts of embezzlement, identity theft, and forgery, and she was sentenced to five years and four months in prison.

On appeal, Silva claims that her statements to police were obtained in violation of her Fifth Amendment right to remain silent and that insufficient evidence supports the embezzlement conviction.  We reject the Fifth Amendment claim, but we agree the embezzlement conviction lacks substantial evidence because Silva was not entrusted with the money she

stole. Therefore, we reverse that conviction, vacate the sentence, and remand for resentencing.[1]

## I.
### FACTUAL AND PROCEDURAL BACKGROUND

Around 2008, Silva was hired as an office administrator at a small Pittsburg limited liability company that provided construction-related cleaning services. The company had three partners, and the managing partner worked in the office with Silva. In 2011, Silva was promoted to office manager and became a salaried employee, ultimately making $40,000 a year plus benefits.

As office manager, Silva routinely used QuickBooks, the company's accounting software system. She was responsible for accounts payable and receivable and for keeping the checkbook balanced, and she used the program to print checks for a partner's signature. She was not authorized to sign checks on behalf of the company or its partners.

One day in January 2017, the managing partner told Silva he was going to the bank. He intended to draw from the company's line of credit to pay taxes, but at the bank he "learned that the line of credit was exhausted and was no longer available." When he returned to the office, Silva was gone and her office key had been left behind. She never returned to work, and the partner's attempts to contact her were unsuccessful.

An audit of the company's records revealed several irregularities, including checks made out to Silva outside of her normal payroll checks "that were never recorded on the QuickBooks file" and checks recorded in

---

[1] As a result, we need not address Silva's other claims involving the embezzlement conviction. Silva also raises claims of sentencing error, which we address to guide the trial court on remand.

2

QuickBooks as being made out to vendors that were actually made out to Silva. The managing partner's signature had been forged on the checks. Between 2014 and 2017, nearly $250,000 was improperly paid to Silva, of which approximately $230,000 was deposited into her personal bank account.[2]

Silva was interviewed and arrested by the Pittsburg police in June 2017. Before trial, she unsuccessfully moved to suppress her statements to the police, and her recorded interview was played for the jury. During the interview, Silva admitted that she made out checks to herself, traced the managing partner's signature onto them, and deposited them into her banking account or at a check cashing store. She also admitted that she used the company's credit card to pay her daughter's phone bill. Silva claimed she became "desperate" when her mother got sick, and she took the money to help pay for her mother's care and mortgage.

Silva was charged by indictment with one count of embezzlement, two counts of identity theft (the company and the managing partner), and three counts of forgery (one for each year of conduct), all felonies.[3] As to the embezzlement charge, it was alleged that Silva stole over $65,000. It was also alleged as to all the charges that Silva committed a pattern of fraud and embezzlement involving the taking of more than $100,000 (aggravated white collar crime).[4] The jury convicted Silva of all the charges and enhancements.

---

[2] There was evidence that Silva began stealing money in 2012, but she was charged for conduct from 2014 onward.

[3] The charges were brought under Penal Code sections 504 (embezzlement), 530.5, subdivision (a) (identity theft), and 470, subdivision (a), and 473, subdivision (a) (forgery). All further statutory references are to the Penal Code.

[4] The allegations were made under former section 12022.6, subdivision (a)(1) (loss over $65,000), and section 186.11, subdivision (a)

In October 2019, the trial court sentenced Silva to a total term of five years and four months in prison, composed of the aggravated term of three years for one of the forgery convictions and consecutive terms of eight months each for the other two forgery convictions and one year for the enhancement for aggravated white collar crime. Eight-month terms for the other convictions and a one-year term for the $65,000-loss enhancement were imposed and stayed.

II.

DISCUSSION

A.    *The Admission of Silva's Statements to the Police Did Not Violate the Fifth Amendment.*

    1.    Additional facts

In June 2017, two Pittsburg police officers contacted Silva at her home and asked her to come to the police station to talk. Silva asked whether they could speak at her home, but she agreed to go to the station after the officers indicated it would be more private. The officers offered to drive her there and back, but they agreed when Silva said she would prefer to drive herself.

Silva was interviewed in a closed room at the station. At the interview's outset, one of the officers told Silva, "Um, just wanna let you know you're not under arrest. We just have a couple [of] questions for you. The door's unlocked. You're free to leave at any time. Okay?" Silva responded, "Mm-hm." The following exchange then occurred:

    Q:    Um, you know why we came to your house?

---

(aggravated white collar crime). Section 12022.6 was repealed effective January 1, 2018, but the repeal was not retroactive and the enhancement may be imposed for conduct before that date. (*People v. Medeiros* (2020) 46 Cal.App.5th 1142, 1157; *People v. Abrahamian* (2020) 45 Cal.App.5th 314, 336–338.) In addition, as to the embezzlement count, Silva was alleged to be ineligible for probation under section 1203.045, subdivision (a), because the offense was a theft over $100,000.

4

A:     I think so, yeah.

Q:     Okay.  Why do you think we're at your house?

A:     Uh, because of my employment at [the company].

Q:     Okay.  What's going on?

A:     I don't work there any[]more.

Q:     I know.  So what happened?

A:     I s- I have an attorney.

Q:     For what?

A:     In case you guys – because I knew you guys would probably come.

Q:     Why do you think we were gonna come?

A:     Because I did things I probably shouldn't [have] done.

Q:     Okay.  You gotta be a little more specific, Jenelle.

A:     I'm not supposed to talk without my attorney though.

Q:     Okay.  J[e]nelle?

Q1:    You're not under arrest.

Q:     You're not under arrest.  We . . .

Q1:    Okay.  An attorney works when you're under arrest, an attorney works.  If you're not under arrest, it – I mean you can – you can…

A:     But I'm going to get in trouble.

Q1:    . . . you can – Jenelle?  It's Jenelle, right?

5

A:    Yeah.

Q:    Look, I . . .

A:    Thank you for being so kind.

Q1:   . . . can see this is weighing on you.

The officers expressed that they understood Silva was dealing with difficult family circumstances and did not think she was "a bad person," because "[e]verybody makes mistakes." One officer stated, "Um, we just kinda wanna know what's going on with your past employment. . . . [W]e have questions. Well, we kinda wanna know the reasoning behind it. You're saying that you knew that we were already coming." Silva responded, "Yeah." The officer continued, "And you already sought legal representation. But, like we said, you're not under arrest right now. We just wanna get your side of the story. Do you want to talk to us and just – I mean we're here. We're gonna work with you and, like my partner said, we don't dislike you in any way. We're just following up on some things."

Silva proceeded to describe her motivations for taking money from the company. She explained the process by which she wrote herself checks and used the company credit card. Silva was then arrested and read her *Miranda*[5] rights. After she stated that she understood her rights, she gave a fuller and more detailed confession.

Before trial, the prosecution moved to admit Silva's police statements into evidence. Silva moved to exclude them as "taken in violation of her 5th and 6th Amendment rights" and *Miranda*. Video recordings of her interactions with the officers were submitted to the trial court.

---

[5] *Miranda v. Arizona* (1966) 384 U.S. 436 (*Miranda*).

At the hearing on the motions, the prosecutor argued that until Silva was arrested, she was not in custody and *Miranda* did not apply. By analogy to another case, he argued she did not invoke her right to remain silent by saying that "[her] attorney has told her not to talk to the police, in a noncustodial setting."

Silva's trial counsel responded that a reasonable person in Silva's position would not have believed she was free to leave the interview, and the situation was akin to a custodial interrogation. Counsel argued that Silva's saying she had an attorney and was "not supposed to talk without [him]" was "much clearer" than the statement in the case the prosecutor cited. Counsel also took issue with the officers' "say[ing] things like, 'Well, a lawyer only works for you when you're under arrest. If you're not under arrest, I mean, you can.' So, they're also dissuading her and explaining things kind of incorrectly. . . . [A] lawyer only works for you when you're under arrest isn't accurate."

The trial court ruled that Silva's interaction with the police did not amount to a custodial interrogation until Silva was arrested and read her *Miranda* rights. After noting the officers earlier told her she was not under arrest and was free to go, the court observed, "[T]here was no obvious coercion at any point. The questioning was certainly low key. There was no abusive language. There was no coercion from the officers as far as eliciting information from [Silva]. She talked freely and explained her side of things." The court also ruled that Silva did not unequivocally invoke her right to remain silent by indicating she had an attorney and was not supposed to talk without him. The court denied Silva's motion to exclude the police statements, concluding that her constitutional rights were not violated "based on the totality of the . . . interrogation."

7

### 2. Analysis

"The Fifth Amendment's self-incrimination clause states that '[n]o person . . . shall be compelled in any criminal case to be a witness against himself . . . .' (U.S. Const., 5th Amend.)" (*People v. Tom* (2014) 59 Cal.4th 1210, 1222–1223.) Whether a defendant's right to remain silent has been violated presents a mixed question of law and fact. (See *Thompson v. Keohane* (1995) 516 U.S. 99, 111–112; *People v. Sanchez* (2019) 7 Cal.5th 14, 48.) On review, "we accept the trial court's resolution of any factual dispute to the extent the record supports it" (*Sanchez*, at p. 48), and we review de novo legal issues. (*People v. Gamache* (2010) 48 Cal.4th 347, 385.)

" 'The [Fifth] Amendment speaks of compulsion,' " and it does not prevent a witness from voluntarily making incriminating statements. (*Minnesota v. Murphy* (1984) 465 U.S. 420, 427 (*Murphy*).) If a witness wishes to be protected by the privilege, the witness " 'must claim it or . . . [else] not be considered to have been "compelled" within the meaning of the Amendment.' " (*Ibid.*) On appeal, Silva concedes that she did not meet this "express invocation requirement" (*Salinas v. Texas* (2013) 570 U.S. 178, 183 (plur. opn. of Alito, J.) (*Salinas*)), and she does not challenge the trial court's ruling that she failed to invoke her right to remain silent. Rather, she claims that an exception to the express invocation requirement applies because "[t]he record reveals deception and trickery by the police officers which interfered with her exercise of her free and deliberate judgment regarding her right to silence." We are not persuaded.

There are two general exceptions to the express invocation requirement. (*Salinas*, *supra*, 570 U.S. at pp. 183–184 (plur. opn. of Alito, J.).) First, "a criminal defendant need not take the stand and assert the privilege at [the defendant's] own trial." (*Id.* at p. 184, citing *Griffin v.*

8

*California* (1965) 380 U.S. 609, 613–615.) Second, "a witness'[s] failure to invoke the privilege must be excused where governmental coercion makes [the] forfeiture of the privilege involuntary." (*Salinas*, at p. 184.)

Silva relies on the governmental-coercion exception. The most familiar example of this exception "addresses the problem of confessions obtained from suspects in police custody," a setting "thought to contain 'inherently compelling pressures which work to undermine the individual's will to resist and to compel [the individual] to speak where [the individual] would not otherwise do so freely.' " (*Murphy, supra*, 465 U.S. at pp. 429–430, quoting *Miranda, supra*, 384 U.S. at p. 467.) "To dissipate 'the overbearing compulsion . . . caused by isolation of a suspect in police custody,' [citation], the *Miranda* Court required the exclusion of incriminating statements obtained during custodial interrogation unless the suspect fails to claim the Fifth Amendment privilege after being suitably warned of [the] right to remain silent and of the consequences of [the] failure to assert it." (*Murphy*, at p. 430.)

The Supreme Court has also "held that threats to withdraw a governmental benefit such as public employment sometimes make exercise of the privilege so costly that it need not be affirmatively asserted." (*Salinas, supra*, 570 U.S. at p. 185 (plur. opn. of Alito, J.).) Similarly, "where assertion of the privilege would itself tend to incriminate, . . . witnesses [may] . . . exercise the privilege through silence." (*Ibid.*) The unifying principle behind the cases addressing the governmental-coercion exception "is that a witness need not expressly invoke the privilege where some form of official compulsion denies [the witness] 'a "free choice to admit, to deny, or to refuse to answer." ' " (*Ibid.*)

9

On appeal, Silva concedes she was not in custody during the portion of the police interview at issue, and the officers therefore had no duty to give her a *Miranda* warning before questioning her. She contends, and we agree, that she nonetheless had a Fifth Amendment right to remain silent during the noncustodial part of the interview. In *Salinas*, the defendant was subject to a noncustodial interview, and the Supreme Court's holding that he was not "deprived of the ability to voluntarily invoke the Fifth Amendment" was predicated on the assumption that he had a right to remain silent in that context. (*Salinas, supra*, 570 U.S. at p. 186 (plur. opn. of Alito, J.).) Likewise, in *Murphy*, the defendant "was not 'in custody' when he made his incriminating admissions," and the Supreme Court assumed he had a right to remain silent in holding that his "failure to claim the privilege in a timely manner" precluded relief. (*Murphy, supra*, 465 U.S. at pp. 430–431.) Thus, as Silva succinctly puts it, although she "was not entitled under *Miranda* to be *informed* of her right to remain silent, she nevertheless *possessed* the right to remain silent."

Silva claims she was coerced into not invoking her right to remain silent because the police officers "affirmatively misadvised her regarding [her] attorney's role and advice" and "attempted to dissuade her from taking her attorney's advice" to remain silent. She relies on two portions of the interview. First, when she said she was "not supposed to talk without [her] attorney," both officers stated she was not under arrest, and one of them said, "An attorney works when you're under arrest, an attorney works. If you're not under arrest, it – I mean you can – you can . . . ." Second, the other officer later stated, "And you already sought legal representation. But like we said, you're not under arrest right now." Silva argues that the officers thereby falsely implied "that an attorney was irrelevant" and that "her

attorney did not truly represent her because she was not under arrest," which "simultaneously downplayed the significance of the advice she had received."

The primary problem with Silva's argument is that she had no constitutional right to counsel because the interaction occurred during a noncustodial interrogation. *Miranda* recognized a Fifth Amendment right to counsel as one of the "procedural safeguards effective to secure the privilege against self-incrimination" during "*custodial* interrogation of the defendant." (*Miranda, supra*, 384 U.S. at p. 444, italics added.) As the Supreme Court later explained, *Miranda* "established a number of prophylactic rights designed to counteract the 'inherently compelling pressures' of custodial interrogation, including the right to have counsel present." (*McNeil v. Wisconsin* (1991) 501 U.S. 171, 176.) This right to counsel under *Miranda* is distinct from the Sixth Amendment right to counsel, which "does not attach until a prosecution is commenced." (*McNeil*, at p. 175.) Thus, during the portion of the police interview that was concededly noncustodial, Silva had no right to counsel.

Given this, the police officers' challenged statements were neither inaccurate nor misleading, and they did not minimize the advice Silva received from counsel. Silva indicated that she was advised not to talk to the police *outside her attorney's presence*, not that she had been advised to remain silent, period. The response that "[a]n attorney works when you're under arrest" and that Silva was not under arrest therefore suggested she should not be concerned about talking to the officers because she did not have the right to counsel's presence during that stage of questioning, not because she did not have the right to remain silent. As the officers had already informed Silva, she was free to leave, and their statements did not suggest that she should not or could not terminate the interview if she wished to consult with

11

her attorney.  Rather, in context, the statements conveyed merely that if Silva wished to talk, her attorney's absence should not hinder her since she was not under arrest.  In short, the officers did not impinge on Silva's " ' "free choice to admit, to deny, or to refuse to answer" ' " their questions.  (*Salinas*, *supra*, 570 U.S. at p. 185 (plur. opn. of Alito, J.).)  Accordingly, her pre-arrest statements were properly admitted.

B.      *Insufficient Evidence Supports the Embezzlement Conviction.*

Silva next claims there was insufficient evidence that the company's money was entrusted to her, a required element of embezzlement under section 504.  We agree.

In evaluating this claim, " 'we review the whole record to determine whether . . . [there is] substantial evidence to support the verdict . . . such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.  [Citation.]  In applying this test, we review the evidence in the light most favorable to the prosecution and presume in support of the judgment the existence of every fact the jury could reasonably have deduced from the evidence.' " (*People v. Manibusan* (2013) 58 Cal.4th 40, 87.)

In relevant part, section 504 provides, " '[E]very officer, director, trustee, clerk, servant, or agent of any association, society, or corporation (public or private), who fraudulently appropriates to any use or purpose not in the due and lawful execution of that person's trust, any property in his or her possession or under his or her control by virtue of that trust, or secretes it with a fraudulent intent to appropriate it to that use or purpose, is guilty of embezzlement.' " " '[T]he offense of embezzlement contemplates a principal's entrustment of property to an agent for certain purposes and the agent's breach of that trust by acting outside [the agent's] authority in [the agent's] use of the property.' " (*People v. Selivanov* (2016) 5 Cal.App.5th 726, 750.)

12

Thus, to prove a violation of this statute, the People must show that the appropriated property was entrusted to the defendant and in the defendant's possession or control "by virtue of that trust." (§ 504; see *Selivanov*, at p. 750; *People v. Schramling* (1987) 192 Cal.App.3d 989, 993.)

Silva argues that the company "did *not* entrust [her] with the contents of its bank accounts" because it did not authorize her to sign checks or draw on the line of credit. She claims she "acted only as a scrivener, producing checks for a partner's signature," and "[t]he only properties under her custody and control were the paper upon which the checks were printed and the ink used to print them."

We agree with Silva that the stolen property, the company's money, was not entrusted to her within the meaning of section 504. Property is not necessarily entrusted to a person just because the person is given *access* to it. For example, in *People v. Montarial* (1898) 120 Cal. 691 (*Montarial*), a friend permitted the defendant to keep the friend's money, which the friend wrapped in packages, in the defendant's trunks. (*Id.* at pp. 692–693.) Although the defendant had the keys to the trunks, the friend never gave him "the right to handle or disturb either package in any way, except in [the friend's] presence . . . , and then only for the purpose of handing them out when wanted by [the friend], or replacing them at his direction." (*Id.* at p. 693.) The defendant later stole the money and was convicted of grand larceny. (*Id.* at p. 692.)

*Montarial* rejected the defendant's claim that the evidence instead established embezzlement under section 503 (*Montarial*, *supra*, 120 Cal. at p. 694), which defines the term "embezzlement" as "the fraudulent appropriation of property by a person to whom it has been intrusted." (§ 503.) The Supreme Court explained that the friend did not "ever in fact

13

really part[] with the possession of his money. While it was locked in the trunks of [the] defendant, to which the latter retained the keys, the trunks were at all times as much in the possession of [the friend], and with practically the same freedom of access to [him]," and "the only dominion [the] defendant rightfully exercised over [the money] was a perfunctory handling of it in the presence of the owner." (*Montarial*, at pp. 692, 694–695.)

Likewise, there was insufficient evidence here that the company entrusted Silva with possession or control of its money. The Attorney General claims that "the evidence showed that [Silva] was entrusted with the safekeeping of the [company's] checking account," pointing to the managing partner's affirmative answer when asked if he "entrust[e]d Ms. Silva with control of [his] bank accounts because [he] trusted that she would use it appropriately as an employee." But Silva's access to the account and responsibility for keeping it balanced does not establish that the company "entrusted" her with the money in it in the legal sense of that term. (See *Montarial*, *supra*, 120 Cal. at p. 694 [friend's testimony that the friend " 'intrusted' the money" to the defendant did not establish entrustment required for embezzlement].) Although Silva had access to QuickBooks, which enabled her to print the checks on which she forged the managing partner's signature, she did not have authority to disburse funds without the company's approval.

As a result, this case is distinguishable from *People v. Knott* (1940) 15 Cal.2d 628, which rejected a county auditor's argument that "she did not have any of the county's money in her possession or under her control within the meaning" of section 504. (*Knott*, at p. 631.) The Supreme Court explained, "Although the county treasurer is charged with the receipt and disbursement of county money [citation], such funds, at least to a limited

14

extent, are within the control of the auditor. One who is not in possession of money may have it under [one's] control in the sense that it is under [one's] direction and management. . . . [The defendant], as auditor, although not in possession of the county's money, had authority to issue warrants payable by the treasurer . . . [that] required no approval by any other public officer." (*Ibid.*) Here, in contrast, Silva was not authorized to issue *cashable* checks on her own, and she therefore lacked control over the company's money.

The Attorney General also attempts to analogize this case to *People v. Hart* (1915) 28 Cal.App. 335, which held there was sufficient evidence to sustain the defendant's conviction for attempted embezzlement of two checks. (*Id.* at pp. 336–337.) The checks were issued to the victim and "payable to his order when countersigned by him. Without having countersigned these checks, [the victim] had intrusted them to the keeping of the defendant, whose offense appears to have consisted in attempting to dispose of them by having some other person than [the victim] countersign them in [the victim's] name." (*Id.* at p. 336.) *Hart* rejected the defendant's position that "these checks were not payable by the issuer until the signature of the payee was countersigned upon them, and were therefore . . . valueless, and hence not the subject of embezzlement." (*Ibid.*) The decision explained, "It cannot be seriously disputed that these checks were property in the hands of their payee and were of the face value . . . to him or any other person who could successfully counterfeit his signature." (*Id.* at p. 337.) *Hart* is inapposite, because Silva's fraudulent checks had no value until Silva forged the managing partner's signature on them.

In short, although Silva's access to QuickBooks and ability to print checks put her in a position in which she was able to steal money from the company, the company did not entrust her with that money as required

15

under section 504.  As a result, the embezzlement conviction and its accompanying enhancements under section 1203.045 and former section 12022.6 cannot stand.

### C.  *The Sentencing Issues Raised by Silva*

Because we reverse the embezzlement conviction, we remand for " 'a full resentencing as to all counts . . . , so the trial court can exercise its sentencing discretion in light of the changed circumstances.' " (*People v. Buycks* (2018) 5 Cal.5th 857, 893.)  Thus, Silva's sentence-related claims are moot.  Nonetheless, we briefly address them, other than the one involving the embezzlement conviction, to guide the court on remand.

To begin with, the parties properly agree that Senate Bill No. 567 (2021–2022 Reg. Sess.), which amended section 1170 to alter a trial court's discretion to choose the lower, middle, or upper term, applies to Silva because her judgment is not yet final.  (*In re Estrada* (1965) 63 Cal.2d 740, 745; *People v. Jones* (2022) 79 Cal.App.5th 37, 45; *People v. Lopez* (2022) 78 Cal.App.5th 459, 465.)  Silva was sentenced to the upper term on the principal forgery count, and she could benefit from the new law since it makes the middle term the presumptive term.  (See § 1170, subd. (b)(1)–(2).)  Thus, on remand, the trial court shall apply the current version of section 1170 in resentencing Silva.

Next, Silva claims, and the Attorney General concedes, that the trial court lacked authority to order restitution for uncharged conduct.  The court awarded the company direct victim restitution of $297,269.61, "the amount of the proven losses at the trial."  This figure included losses from 2012 and 2013, years predating the charged crimes.  We agree with the parties that on remand, the court must recalculate the amount of direct victim restitution to

exclude losses based on uncharged conduct. (See *People v. Lai* (2006) 138 Cal.App.4th 1227, 1246.)

We also agree with the parties that as a result, the fine imposed under section 186.11 must be recalculated. Under section 186.11, subdivision (c), if the conduct underlying an enhancement for aggravated white collar crime "involves the taking of more than one hundred thousand dollars ($100,000), but not more than five hundred thousand dollars ($500,000)," the defendant is "liable for a fine not to . . . exceed one hundred thousand dollars ($100,000) or double the value of the taking, whichever is greater." Here, the trial court imposed a section 186.11 fine of $594,539.22, double the amount of the $297,269.61 direct victim restitution award. Since that award must be recalculated to exclude losses based on uncharged conduct, the section 186.11 fine must be recalculated as well.[6] (See *People v. Lai*, *supra*, 138 Cal.App.4th at p. 1246.)

Finally, Silva claims, and we agree, that the trial court improperly imposed a $300 restitution fine under section 1202.4 on each count. The court stated that it was imposing "separate restitution fund fines on each [c]ount because they're each a felony, . . . [b]ut all those restitution fund fines will be stayed." The abstract of judgment reflects a stayed $1800 restitution fine under section 1202.4, subdivision (b). Only one restitution fine per case may be imposed under that provision, however. (*People v. Sencion* (2012)

---

[6] Silva also argues that the trial court had discretion to impose a fine of less than double the amount of the direct victim restitution award, since section 186.11 states merely that the fine "shall not exceed" that amount. (§ 186.11, subd. (c).) The Attorney General did not respond to this claim, and the trial court may address the issue in the first instance.

17

211 Cal.App.4th 480, 483.)  Thus, on remand the court may not impose multiple fines under section 1202.4, subdivision (b).[7]

### III.
### DISPOSITION

The embezzlement conviction and its accompanying enhancements under section 1203.045 and former section 12022.6 are reversed, and the sentence is vacated.  The matter is remanded for full resentencing consistent with this opinion.  The judgment is otherwise affirmed.

---

[7] In turn, under section 1202.45, the trial court must also impose a single fine equal to the restitution fine.  The court imposed and stayed "a parole revocation fine of $300 under [section] 1202.45," but the abstract of judgment incorrectly reflects a stayed $1800 fine under that statute.  In addition, it appears that fine should be assessed under subdivision (b) of section 1202.45, which applies to defendants subject to postrelease community supervision or mandatory supervision, not subdivision (a), which applies to paroled defendants.

18

                         _____

                         Humes, P.J.

WE CONCUR:


_____

Banke, J.


_____

Wiss, J. *


     *Judge of the Superior Court of the City and County of San Francisco, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

*People v. Silva*  A159074